John F. KNIGHT, Alma S. Freeman, John T. Gibson, Susan Buskey, Carl Petty, Dennis Charles Barnett by his father Arthur D. Barnett, Vonda Cross, Tammi Palmer, Alease S. Sims, Stacey Levise Sims by her parents Levi Sims and Alease S. Sims, Gary Mitchell, Jr., Grover L. Brown, Frederick Carodine, Frankie Patricia Yarbrough, Dr. Charles Edwards McMillan, Horace W. Rice, Anthony Y. Lavonne Thompson, by his mother, Lois N. Thompson, Kreslyon Lynette Valrie by her mother Georgia S. Valrie, Dr. Taylor Byrd, and Dan Tibbs, Jr., individually and on behalf of others similarly situated, Plaintiffs and Plaintiffs–Intervenors–Appellants–Cross–Appellees,

v.

The STATE OF ALABAMA; Jim Folsom, Governor of the State of Alabama; Defendants–Appellees,

The Alabama State Board of Education; John M. Tyson, Jr., Steadman S. Shealy, Jr., Isabelle B. Thomasson, Ethel H. Hall, Willie J. Paul, Spencer Baccus, Victor P. Poole, and Evelyn Pratt, as members of the Alabama State Board of Education, Defendants–Appellees–Cross–Appellants,

Wayne Teague, State Superintendent of Education; the Alabama Commission on Higher Education; Jane McDonald, Clyde Foster, Katie Espy, Dr. James D. Grady, III, Charles F. Horton, Ken Lott, Steve Means, Borden Morrow, Frank A. Nix, Richard A. Pizitz, Sr., Philip A. Sellers, and Bob Word, as members of the Alabama Commission on Higher Education; The Alabama Public School and College Authority; G. Robin Swift, as State Finance Director and member of the Alabama Public School and College Authority, Defendants–Appellees,

The Board of Trustees for Alabama A & M University; Franklin Perry, Eddie Player, Wayman Sherrer, George Miller, Chris McNair, W. Troy Massey, Robert Hughes, Thomas Fuller, Wayne Dean, Walter Carter, Dinsimore Robinson, and Dr. Oscar Tucker, as members of the Board of Trustees for Alabama A & M University, Defendants–Appellants–Cross–Appellees,

The Board of Trustees for Alabama State University; Richard Arrington, Jr., Larue W. Harding, Andrew M. Hayden, Lillian Ann Hope, Larry H. Keener, Patsy B. Parker, Joe L. Reed, James A. Smith, and Mrs. Frankye Underwood, as members of the Board of Trustees of Alabama State University, Defendants–Appellees–Cross–Appellants,

Ross Dunn, Tommy Gallion, Michael Onderdonk, as members of the Board of Trustees of Alabama State University; Auburn University; R.C. Bamberg, Dr. Emory Cunningham, John V. Denson, Dr. Bessie Mae Holloway, Robert E. Lowder, Michael B. McCartney, William F. Nichols, F. James Samford, Jr., Morris W. Savage, and James T. Tatum, Jr., as members of the Board of Trustees of Auburn University; Troy State University; Harold R. Collins, R. Douglas Hawkins, Robert E. Kelly, Jack W. Wallace, John A. Teague, C.J. Hartley, Wallace D. Maline, Jr., Robert T. Wilson, Charles B. Martin, and Russ Campbell, as members of the Board of Trustees for Troy State University; The University of Alabama; Winton Blount, Aaron Aronov, Massey Bedsole, Frank Bromberg, Jr., O.H. Delchamps, Jr., Garry Neil Drummond, Sandral Hullett, William Henry Mitchell, John T. Oliver, Jr., Thomas E. Rast, Yet-

ta G. Samford, Jr., George S. Shirley, Martha H. Simms, Cleophus Thomas, Jr., Cordell Wynn, John B. Hicks, and Dr. Thomas A. Bartlett, as members of the Board of Trustees for the University of Alabama, Defendants–Appellees.

The UNITED STATES of America, Plaintiff,

v.

The STATE OF ALABAMA; Jim Folsom, Governor of the State of Alabama; the Alabama State Board of Education; Wayne Teague, State Superintendent of Education; Alabama A & M University; a public corporation, Defendants–Appellees,

Alabama State University; a public corporation; Athens State College, an educational institution; Calhoun State Community College, an educational institution, Defendants–Appellees–Cross–Appellants,

Auburn University, a public corporation; Jacksonville State University, a public corporation; Livingston University, a public corporation; Troy State University, a public corporation; the University of Montevallo, a public corporation; the University of Alabama, a public corporation; the University of North Alabama, a public corporation; the University of South Alabama, a public corporation; the Alabama Commission on Higher Education; and the Alabama Public School and College Authority, Defendants–Appellees.

No. 92–6160.

United States Court of Appeals, Eleventh Circuit.

Feb. 24, 1994.

James U. Blacksher, Demetrius Newton, Birmingham, AL, for Knight, et al.

John C. Falkenberry, Birmingham, AL, for Bd. of Trustees for AL, et al.

Edward W. Allen, Balch & Bingham, Birmingham, AL, T.W. Thagard, Jr., David R. Boyd, Balch & Bingham, Montgomery, AL, for Auburn University.

Walter J. Merrill, Anniston, AL, for Jacksonville State University.

William F. Murray, Jr., Burr & Forman, Birmingham, AL, Bd. of Trustees of Troy State University.

J. Fredric Ingram, Burr & Forman, Birmingham, AL, for Livingston University.

Daniel R. Farnell, Jr., Jeffery A. Foshee, Foshee & Associates, Montgomery, AL, for AL State Bd. of Educ., Its Members, Gainous, Athens State College, and Calhoun State Community College.

C. Glenn Powell, Norma M. Lemley, Stanley J. Murphy, Office of Counsel, Tuscaloosa, AL, for Bd. of Trustees of University of AL.

Maxey J. Roberts, Mobile, AL, for University of South AL.

Jack W. Selden, Caryl P. Privett, Asst. U.S. Atty., Birmingham, AL, Mark L. Gross, U.S. Dept. of Justice, Washington, DC, for U.S.

Carl E. Johnson, Jr., Bishop, Calvin, Johnson & Kent, Birmingham, AL, for University of Montevallo.

John E. Grenier, Robert D. Hunter, Rebecca S. Dunnie, Lange, Simpson, Robinson & Somerville, Birmingham, AL, for State of AL, Jim Folsom, AL Com'n on Higher Educ. & Its Members, AL Public School & College Authority, and James H. Rowell.

Ernest N. Blasingame, Jr., Florence, AL, for University of North AL.

Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuykendall, & Whatley, Birmingham, AL, for Bd. of Trustees of AL A & M University.

Solomon S. Seay, Jr., Montgomery, AL, for Bd. of Trustees for AL State University and Individual Members.

Fred D. Gray, Gray, Langford, Sapp, McGowan & Gray, Tuskegee, AL, Armand Derfner, Charleston, SC, for AL State University.

Before ANDERSON and BLACK, Circuit Judges, and NANGLE *, Senior District Judge.

ANDERSON, Circuit Judge:

This lawsuit challenges the structure of and allocation of resources under Alabama's system of public higher education, charging that the State of Alabama and the other defendant institutions have not fulfilled their obligation to remedy vestiges of past *de jure* segregation that remain in the current system. In December 1991, following a bench trial, the district court found liability and ordered the state defendants to take various remedial measures. Plaintiffs filed this appeal challenging several aspects of the district court's decision. Then, in June 1992, the Supreme Court decided *United States v. Fordice,* —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), the Mississippi higher education desegregation case. *Fordice* was the Court's first pronouncement on the constitutional standards governing liability and remedies for past *de jure* segregation in the higher education context. For the reasons set forth below, we affirm in part, reverse in part, vacate in part, and remand the case to the district court.

## I. BACKGROUND

### A. *Overview History of Access by Blacks to Public Higher Education in Alabama*

The district court opinion sets forth in detail the history of the role race has played in public higher education in Alabama. *See Knight v. State of Alabama,* 787 F.Supp. 1030, 1065–1153 (N.D.Ala.1991). In very broad terms, for more than a century following its admission to the Union in 1819, Alabama denied blacks all access to college-level public higher education and did so for the purpose of maintaining the social, economic, and political subordination of black people in the state. *Id.* at 1066–95. Until Reconstruction, all education of enslaved black persons was criminalized in Alabama. Following Reconstruction, blacks were excluded from the universities attended by whites, relegated instead only to vastly inferior institutions that did not even begin to offer college-level courses until required to do so by a 1938 Supreme Court decision. Although they were upgraded somewhat beginning in the 1940's, the institutions to which blacks were restricted by state law continued to be allocated a radically disproportionately small share of the resources devoted by the state to public higher education. In the 1960's, federal courts finally forced the white institutions to admit their first black students.

---

* Honorable John F. Nangle, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

Over the succeeding three decades, although increasing numbers of black students have been admitted to historically white institutions ("HWIs"), their representation in the student bodies of the majority of such four-year universities, notably the state's "flag-ship" research institutions, the University of Alabama and Auburn University, has remained proportionally quite low. *See id.* at 1063, ¶ 17. A significantly disproportionate share of black Alabamians has continued to attend the historically black institutions ("HBIs") and those institutions have attracted relatively few white students. *See id.*

B. *History of this Case*

Originally filed in 1983, this case has been passing back and forth between the district court and the court of appeals for ten years and has a complicated procedural history. For an account of that history, see the opinion of the district court, 787 F.Supp. at 1047–51. Briefly, the action was originally instituted by the United States, exercising its statutory authority to bring suit to enforce Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* A class of private plaintiffs represented by John F. Knight and other named plaintiffs who had previously filed a separate parallel suit was permitted to intervene. Knight and the other named plaintiffs were certified as representing in this suit a class composed of both the black citizens of Alabama generally, and the students, faculty, staff, and administrators of Alabama State University ("ASU") and Alabama A & M University ("A & M"), the two HBIs in the Alabama system. The defendants are the State of Alabama, several state education-related agencies, and most of the state's four-year public universities (collectively referred to as "the state defendants"). The university defendants include the state's HWIs, chief among them the University of Alabama and Auburn University, as well as historically black ASU and A & M.

Plaintiffs charge that in a wide range of areas, Alabama has maintained structures, policies, and practices that are vestiges of the prior *de jure* segregated regime and that continue to promote segregation in the state university system. The policies that plaintiffs challenge as unconstitutional include: admissions standards at HWIs that serve to disqualify disproportionate numbers of black applicants; underrepresentation of blacks in the faculties and administrations and on the governing boards of HWIs; curricula at HWIs that include little representation of black history, thought, or culture; campus environments at HWIs hostile to blacks; duplication at HWIs of programs available at geographically proximate HBIs; denial of adequate funding and facilities to HBIs, including denial of state and federal land grant funds to HBIs; and denial of graduate and other desirable programs to HBIs through restrictive institutional missions. For a detailed summary of plaintiffs' contentions and those of the other parties, see 787 F.Supp. at 1051–61.

C. *District Court Decision*

During 1990 and 1991, the district court, Judge Harold L. Murphy of the Northern District of Georgia sitting by special assignment, conducted a six-month bench trial during which the court heard approximately 200 witnesses and received hundreds of thousands of pages of exhibits. In December 1991, the court issued a 360-page opinion in which it found liability and ordered the state defendants to take various remedial measures. Among other things, the court found that vestiges of segregation remain in the Alabama public university system in the areas of faculty and administrative employment, state funding, facilities at HBIs, admissions policies at HWIs, and program duplication. *See id.* at 1368. The court's remedial decree ordered defendants to institute specific modifications to policies and practices in these areas so as to remove barriers to increase black access to HWIs and to encourage whites to attend HBIs. *See id.* at 1377–82. The court declined to hold that either the state's allocation of funding for land grant programs, the institutional missions assigned to the HBIs, the campus environments at the HWIs, or the curricula at the HWIs is a vestige of segregation. It therefore ordered no relief in those areas. Six months later in June 1992, the Supreme Court decided *United States v. Fordice,* ——

U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992).

## II. ISSUES ON APPEAL

Appealing from the district court decision, the Knight plaintiffs challenge the court's denial of relief on the claims concerning (1) the missions of the HBIs; (2) land grant funding; (3) the curricula of the HWIs; and (4) the campus environments of the HWIs. The two HBIs, ASU and A & M, also appeal asserting, in addition to the issues raised by the Knight plaintiffs, several challenges to the scope of relief ordered by the district court. ASU also appeals the district court's dismissal, for want of standing, of cross-claims that it has attempted to assert against the other non-HBI state defendants. Aside from ASU and A & M, none of the other defendant parties has appealed the district court's judgment.[1]

Although, as explained below, we find it necessary to reverse or vacate, and remand for reconsideration, a few isolated portions of the district court's judgment, in so doing we express nothing but the deepest respect for the manner in which the court below has handled this case. Judge Murphy's management of this complex piece of institutional reform litigation has been extraordinary. His meticulous and scholarly opinion is a model of judicial thoroughness. Writing without the benefit of Supreme Court guidance on the applicable legal standard, Judge Murphy anticipated in considerable measure the standards later set out by the Court in *Fordice*. Our ruling today reversing or vacating, and remanding for reconsideration, a few discrete elements of the court's opinion is based primarily on the legal standards announced by the Supreme Court months after the district court opinion was issued. This disposition therefore in no way reflects negatively on the district court's handling of the case. The fact that defendants do not challenge the district court's judgment at all, and that plaintiffs at this time take issue with only a few isolated rulings, bears witness to the wisdom and fairness manifested in the court's decision.

## III. DISCUSSION

### A. *Preface: United States v. Fordice*

In *United States v. Fordice*, —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), decided six months after the district court opinion in this case, the Supreme Court for the first time addressed the scope and nature of the duty, borne by states that in the past administered *de jure* racially segregated systems of public higher education, to dismantle their prior dual systems. Resolving a division of opinion that had prevailed in the lower courts as to the remedial standard applicable in higher education desegregation suits, *Fordice* rejected the contention that simple "aboli[tion of] the legal requirement that whites and blacks be educated separately and ... establish[ment of] racially neutral policies not animated by a discriminatory purpose," *id.* at ——, 112 S.Ct. at 2737, are sufficient to discharge a state's duty to dismantle "root and branch" its prior dual system. *See id.* at ——, 112 S.Ct. at 2736.

The Supreme Court prescribed a three-step analysis for determining whether a state has fully met its remedial obligation. The first step requires a simple assessment of whether any particular policy that has been challenged as segregative is "traceable" to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation. *Id.* at ——, ——, 112 S.Ct. at 2735, 2736. Where plaintiffs in a lawsuit contend that a state or other public actor has not discharged its duty to dismantle its former system of *de jure* segregated higher education, the burden of proof lies with the

---

1. Originally, two of the defendant HWIs, Athens State College and Calhoun State Community College, cross-appealed, challenging the district court's ruling that they, along with the other defendant institutions, are liable for plaintiffs' attorneys fees. However, subsequently these two parties effectively abandoned that appeal, conceding that decisions like the instant one that declare liability for attorneys fees but do not set the amount of the fees are not appealable. *See* Letter of Jeffery A. Foshee to Miguel J. Cortez (June 15, 1993). As this rule is indeed the law of our circuit, *see McKenzie v. Cooper, Levins & Pastko, Inc.,* 990 F.2d 1183, 1185, n. 2 (11th Cir.1993), we shall not consider Athens State and Calhoun State's cross-appeal.

charging party to show that a challenged contemporary policy is traceable to past segregation.

Upon such a showing, "the burden of proof [then] falls upon the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system." *Id.* at ——, 112 S.Ct. at 2741 (emphasis in original). The state may carry this burden in one of two ways. It may show that the challenged contemporary policy, though traceable to segregation, is not constitutionally objectionable because it does not today have segregative effects. *Id.* at ——, ——, 112 S.Ct. at 2736, 2737. When gauging whether a policy traceable to segregation has such current effects, courts must consider the effect of the policy as it operates in combination with any other challenged policies. *Id.* at ——, ——, 112 S.Ct. at 2741, 2742.

*Fordice* recognized as having segregative effects policies that "influenc[e] student enrollment decisions." *Id.* at ——, ——, 112 S.Ct. at 2737, 2743. In its discussion of several of the *Fordice* plaintiffs' specific challenges to Mississippi higher education policy, the Court offered examples of two broad categories of practices that can inhibit "free choice" by students as to university attendance. The first category comprises policies that have the effect of discouraging or preventing blacks from attending HWIs, examples of which include the maintenance of more stringent admissions requirements for HWIs than for HBIs. *Id.* at ——, ——, 112 S.Ct. at 2738–40. The second category consists of policies that discourage whites from seeking to attend HBIs, examples of which include: duplication of programs at HBIs and HWIs in the same geographic area; the assignment to HBIs of institutional missions that restrict them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs. *Id.* at ——, ——, 112 S.Ct. at 2740–42. As a result of such policies, disproportionate numbers of whites *can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs.

Where the state proves that a challenged policy, shown by plaintiffs to be traceable to segregation, has no segregative effects, it is relieved of its duty to eliminate or modify the policy. *Id.* at ——, 112 S.Ct. at 2741. This inquiry constitutes the second step in the *Fordice* analysis.

The other circumstance in which a state may be relieved of its obligation to abolish or modify policies traceable to segregation obtains where, in effect, it simply is not possible to do so. Where "policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies ... must be reformed to the extent practicable and consistent with sound educational practices." *Id.* at ——, 112 S.Ct. at 2736. Thus, where the state can show that there are no less segregative alternatives which are practicable and educationally sound, then it may permissibly maintain the vestigial practice or policy in place. *Id.* at —— – ——, 112 S.Ct. at 2738–43; *id.* at ——, 112 S.Ct. at 2744 (O'Connor, J., concurring). However, the state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and "the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow." *Id.* at ——, 112 S.Ct. at 2743 (O'Connor, J., concurring).

The state is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects. *Id.* at ——, 112 S.Ct. at 2744 (O'Connor, J., concurring). Moreover, because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered. Rather, a court should consider the full range of all possible alternative remedies, including closure, when determining which would achieve the greatest possible reduction in the identified segregative effects. *Id.* at ——, 112 S.Ct. at 2743. This examination of the practicability and educational soundness of possible alternatives or modifications to a challenged policy

constitutes the third step in the *Fordice* analysis.

Where plaintiffs show that a current policy is traceable to past segregation, and defendants fail to demonstrate either (1) that the policy, in combination with other policies, has no current segregative effects, or (2) that none of the full range of less segregative alternative remedies are practicable and educationally sound, defendants must adopt the practicable and educationally sound alternatives that will bring about the greatest possible reduction in the segregative effects. "If the State has not discharged [this remedial] duty, it remains in violation of the Fourteenth Amendment." *Id.* at ——, 112 S.Ct. at 2735.

**B. *Mission Assignments of HBIs***

1. Background Facts

Plaintiffs argue that the current "mission assignments" of A & M and ASU are vestiges of segregation with continuing segregative effects that the state is obligated to remedy. The University of Alabama's flagship Tuscaloosa campus and Auburn University have in the past and continue today to offer courses and degrees in a far wider range of academic areas than do ASU and A & M and to have far more academic programs offering advanced degrees at the masters and doctoral levels than do ASU and A & M. Indeed, it was not until 1986, after the first district court to try this case had entered a judgment of liability against the state defendants,[2] that the state for the first time approved the establishment of three fledgling doctoral programs at A & M. Testimony of Leon Frazier (1/9/91); Appendix to State of Alabama's Brief, Tab A at 5. ASU still has no doctoral programs. Appendix to State of Alabama's Brief, Tab A at 7.

The predecessor institutions to the universities known today as ASU and A & M were both founded in the nineteenth century. ASU's predecessor, originally founded as a private, black-run institution, was placed under the control of the State of Alabama on the condition of a state pledge, formalized by

statute, "to provide for the liberal education of the colored race in the same manner as [wa]s already provided for the education of the white race in [the state's] Universities and Colleges." 787 F.Supp. at 1076, ¶ 108. However, not only was this pledge subsequently dishonored, but the Alabama Supreme Court went on to rule that it was unlawful for the historically black schools to become universities and that their institutional missions must be limited to those of "normal schools." *Id.* at 1077–82, 1085–86. From 1887 until well into the 1930's, Alabama maintained this normal school limitation on the missions of ASU and A & M in order to deny black citizens access to college education and to restrict the occupations to which they might aspire. *Id.* at 1089, ¶¶ 168–73; 1094, ¶ 203. Even after A & M was designated to be the state's land grant college for blacks in 1890, its programs were restricted to training teachers of manual skills. *Id.* at 1089, ¶ 167.

After *Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938), which required Southern states to provide equal undergraduate programs for black citizens, Alabama allowed ASU and A & M to develop a few college programs. These new curricula were, however, severely limited. 787 F.Supp. at 1097–1103. During the 1950's, 60's, and 70's, the state spent hundreds of millions of dollars establishing and developing new branches of the HWIs in Huntsville and Montgomery, the cities where the HBIs already were located. *Id.* at 1119–30. The University of Alabama and Auburn satellite campuses were then granted high-demand undergraduate, Ph.D., and professional programs that A & M and ASU were not allowed to consider. *Id.*

In 1969, the Alabama legislature by statute established the Alabama Commission on Higher Education ("ACHE") to govern and coordinate the state university system. Among the Commission's statutory tasks is to "classify[ ] and prescrib[e] the role and scope for each public institution of higher education in Alabama...." U.S. Exhibit 2, at v. In 1974, the Commission adopted

---

2. The judgment rendered by the first district court to hear this case was subsequently re-versed. For a summary of this history, see 787 F.Supp. at 1049–50.

"Planning Document Number One," a plan under which each of the system's sixteen four-year and thirty-nine two-year public higher educational institutions was assigned a particular educational mission classification. Planning Document Number One assigned ASU and A & M to the most restrictive of the mission categories for four-year public universities—that of "master's level state university." In contrast, the University of Alabama and Auburn were each assigned the highest institutional classification—that of "comprehensive doctoral university." 787 F.Supp. at 1309–10, ¶¶ 1592–93; Planning Document Number One, U.S. Exhibit 2.

During the period from 1975 to 1985, university expansion and development were governed by Planning Document Number One. Under this regime, ACHE would consider an institution's application for authorization and funding for a new academic program only if the proposed program fell within the range permitted for the institution's particular mission classification. 787 F.Supp. at 1310, ¶ 1597.

In 1985, ACHE replaced the Planning Document Number One classification system with a system of what it termed "Instructional Role Matrices." Rather than assigning each state university to a standardized mission category, the Instructional Role Matrices system specifies for each individual institution the academic fields in which it may offer programs and the permitted degree levels of those programs. (For copies of the Instructional Role Matrices for each of the Alabama public universities, see Appendix to State of Alabama's Brief on Appeal, Tab A.) Whereas, under the Planning Document Number One classification system, institutions were categorically barred from establishing new programs outside of their assigned mission areas and degree ranges, under the new system a university seeking to add a program at a level for which it is not otherwise authorized may petition the ACHE for a "role change" authorizing the program. 787 F.Supp. at 1310–11. Nonetheless, under the new system, ASU and A & M's respective Instructional Role Matrices continue to prescribe for the two HBIs much more limited academic roles than do those of the flag-ship HWIs, Auburn and the University of Alabama at Tuscaloosa, or even those of some of these institutions' satellite campuses such as the University of Alabama at Birmingham. *Compare* Appendix to State of Alabama's Brief on Appeal, Tab A, at 5 & 7 *with id.* Tab A, at 11, 25, & 27.

As noted above, the district court, ruling on plaintiffs' program duplication claim, held that program duplication at geographically proximate HBIs and HWIs in the Montgomery and Huntsville areas is a vestige of segregation that has continuing segregative effects. To remedy the effects of this duplication, the court ordered, among other things, that A & M and ASU be given special preference for any new high-demand programs and certain other programs that the state might establish at public universities in the Huntsville and Montgomery areas, respectively. 787 F.Supp. at 1379–80.

### 2. Plaintiffs' Arguments

Plaintiffs charge that ASU and A & M's inferior mission assignments are traceable to segregation and therefore constitute vestiges of segregation under *Fordice*. Arguing that the missions continue to have segregative effects and that the remedy they propose is practicable and educationally sound, they assert that the state is obligated to upgrade the HBIs' missions. On the first part of the *Fordice* test, they maintain that the current mission assignments are traceable to the limited missions that were imposed on the two HBIs in the past for the purpose of limiting black educational opportunity and social and economic advancement. They note that the district court agreed that ASU and A & M "undoubtedly" were historically assigned inferior missions for discriminatory reasons. Knight Plaintiffs' Initial Brief on Appeal at 26, *quoting* 787 F.Supp. at 1046.

On the second part of the *Fordice* test, plaintiffs argue that the inferior mission assignments continue to have a segregative effect by maintaining the HBIs as inferior institutions that cannot effectively attract white students. In support of this contention they cite *Fordice* in which the Court recognized that limited missions of HBIs will often have this effect. Knight Plaintiffs' Initial

Brief on Appeal at 33–34; *Fordice,* —— U.S. at ——, 112 S.Ct. at 2742. They charge that the state's duty to dismantle the former *de jure* system therefore requires it to upgrade the HBIs' missions.

The remedy plaintiffs seek is that such " 'flagship' and other high prestige programming as Alabama can afford … be shared, on a practicable basis, with ASU and A & M, along with the several campuses of [the University of Alabama] and [Auburn University,] and the University of South Alabama." Knight Plaintiffs' Initial Brief on Appeal at 35. As they only request that this sharing of flagship programs be effected "prospectively rather than in some restitutional fashion," *id.,* plaintiffs contend that, regarding the third part of the *Fordice* test, the state defendants cannot carry their heavy burden of proving that this remedy would be impracticable or educationally unsound. *Id.* Similarly, plaintiffs argue that because they do not request duplication at the HBIs of high-prestige programs already located at the white flagship campuses, but rather prospective, non-duplicative distribution of new high-prestige programs among ASU, A & M, Auburn, the University of Alabama, and the University of South Alabama, their proposed remedy would not result in the development of separate-but-equal black research universities that might exacerbate rather than mitigate segregation. *Id.*

### 3. Defendants' Arguments

Defendants do not dispute that the current limited missions of the HBIs are traceable to *de jure* segregation. State of Alabama's Brief on Appeal at 25; Auburn's Brief on Appeal at 35. However, they argue that the state is not obligated to modify them because the limited missions have no present-day segregative effects. They also contend that, in any event, the HBIs' limited missions are educationally justified and cannot be practicably eliminated.

Defendants interpret plaintiffs' missions claim as seeking relief in the form of an order requiring the state to fully duplicate at the HBIs the panoply of high-demand and high-prestige programs that the University of Alabama and Auburn currently enjoy. On

this basis they argue, as regards the second part of the *Fordice* test, that not only do the HBIs' limited missions not have segregative effects, but that upgrading the missions would actually foster segregation. Contending that upgrading the HBIs' missions would necessarily entail funding high-demand and high-prestige programs at ASU and A & M duplicating those already in place at the flagship HWIs, defendants argue that such relief would actually discourage blacks from attending the HWIs, thereby exacerbating segregation. State of Alabama's Brief on Appeal at 26. In support of this argument defendants cite to and quote from a section of the district court opinion in which they contend the court concluded that mission enhancement for the HBIs is, in fact, constitutionally barred on the grounds that it would result in the establishment of a dual system of separate-but-equal research universities. *Id.* at 25–26, *quoting* 787 F.Supp. at 1046–47. As to their charge that mission enhancement is barred under the third part of the *Fordice* test, defendants assert that enhancement of the HBIs would be impracticable and educationally unsound because it would be costly and would channel resources away from the HWIs. *Id.* at 26–27.

### 4. Analysis

▮ The district court found that the two HBIs currently "have limited missions because of prior state-sponsored discrimination…." 787 F.Supp. at 1046. Thus, the district court made a finding of fact that the limited missions of ASU and A & M are traceable to past discriminatory decisions, thereby resolving the first *Fordice* inquiry in favor of plaintiffs. Defendants acknowledge as much on appeal. State of Alabama's Brief on Appeal at 25; Auburn's Brief on Appeal at 35. We turn then to the second *Fordice* inquiry, whether this vestige of segregation has continuing segregative effects.

It appears to us that the district court never actually addressed the substance of *Fordice*'s second inquiry: whether the HBIs' current mission assignments have continuing segregative effects on student choice. Although in its opinion the court did discuss missions, in doing so the court only consid-

ered the question of whether the adoption and maintenance since 1975 of the current classification system can itself be deemed an act of intentional discrimination that gives rise to liability in its own right. On this point, the court found that the Planning Document Number One classification system from which the current Instructional Role Matrices system derives was not adopted in 1975 for discriminatory reasons but instead was in accord with "sound educational practices used throughout the nation." 787 F.Supp. at 1310–11 & n. 128, ¶¶ 1596–99. On this basis, the court ruled that it "[wa]s not persuaded by the Plaintiffs' evidence" that Alabama's post–1975 mission assignment system is discriminatory. *Id.* at 1310, ¶ 1596. In other words, it concluded that the evidence did not demonstrate the existence of any new constitutional violation during the 1970's or 80's.

■ However, the court's opinion did not address the entirely separate question of whether the limited mission assignments of ASU and A & M, which were preserved under both Planning Document Number One and the current Instructional Role Matrices system, are vestiges of segregation that, alone or in combination with other policies, have continuing segregative effects on student choice that must be eliminated. The court's failure to address the issue in these terms probably resulted, not so much from oversight, but rather from the court's wholly understandable failure to anticipate the *Fordice* standard in all its detail. The court appears to have assumed that where a practice, although traceable to *de jure* segregation, is reconsidered and then reinstituted for non-racial educational policy reasons, then that practice should no longer be deemed a vestige of segregation. *See id.* at 1353, ¶ 2. Addressing precisely such a situation, howev-

er, the *Fordice* Court held that a "mid-passage justification for perpetuating a policy enacted originally to discriminate against black students does not make the present [policy] any less constitutionally suspect." *Fordice,* —— U.S. at ——, 112 S.Ct. at 2738. Thus, the reasons for adoption of the current ACHE classification system in 1974 and 1985 are not determinative of the issue of whether the HBIs' current missions are vestiges of the past segregated regime.

Defendants invite us to affirm the district court's failure to grant relief on the missions claim on the ground that, as a matter of law, limited missions of HBIs cannot have segregative effects or that the remedy of enhancing HBI missions necessarily amounts to establishment of a regime of racially separate-but-equal educational institutions and so is constitutionally barred under *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). State of Alabama's Brief on Appeal at 25–26. We reject this invitation. First, we believe that defendants misconstrue the district court opinion when they contend that the court did, in fact, fail to order mission enhancement on these grounds. Although there is language in the district court opinion concerning separate-but-equal universities for blacks and whites, *see* 787 F.Supp. at 1046–47, we interpret that discussion as relating only to a separate claim asserted by plaintiffs that the district court rejected and that plaintiffs have not appealed.[3] As stated above, the district court never addressed whether the current limited missions of the HBIs have continuing segregative effects that must be remedied.

■ Second, insofar as defendants argue that, as a matter of law, limited missions at HBIs can never be vestiges of segregation having segregative effects, or that HBI mission enhancement can never be required to

---

3. That claim involved an attempt to enforce the pledge made in the nineteenth century to build at Marion, Alabama—the location of ASU's predecessor institution—a separate-but-equal university that was to be the black counterpart of the University of Alabama. The state subsequently reneged on that promise, restricting the institution at Marion to the status of a mere normal school. The court interpreted plaintiffs' invocation of this promise as a contention that the breaking of the promise violated the Fourteenth

Amendment. Viewing this issue as a claim asserted on behalf of ASU seeking, as relief, enforcement of the promise, the court held it unenforceable, first, because state instrumentalities such as ASU cannot sue to enforce the Equal Protection Clause against the state and, second, because enforcement of the promise was constitutionally prohibited under *Brown* as an attempt to require separate-but-equal educational facilities. *Id.* at 1083–84, ¶¶ 145–53.

remedy the effects of past segregation, those contentions fail under *Fordice*. *Fordice* did hold that states are under no constitutional obligation to upgrade HBIs for the purpose of ensuring that there exist black-controlled educational institutions that are fully the equivalent of a states' elite HWIs. *Fordice,* —— U.S. at ——, 112 S.Ct. at 2743. However, not only did the Court not go so far as to say that enhancement of HBIs is constitutionally forbidden under *Brown,* but, to the contrary, it expressly held that where upgrading HBIs "is necessary to achieve a full dismantlement [of the prior *de jure* segregated system]," then such measures can indeed be part of a constitutionally required remedy. *Id.*

■■■ Defendants also contend that, regardless of whether the district court ruled on whether the HBIs' current missions have continuing segregative effects, the court's finding that ACHE's system of assigning different missions to the various state public universities is educationally sound constitutes an adequate alternative ground under the third part of the *Fordice* test for declining to order upgrading of the HBIs' missions. *See* 787 F.Supp. at 1311, ¶ 1599. This contention is without merit. If the limited missions are in fact vestiges of segregation that have continuing segregative effects, then the mere fact that mission differentiation is an educationally sound policy would not be sufficient to relieve the state of its duty to eliminate the vestiges' effects. Under *Fordice,* a state can be required to change even educationally sound practices where they have been found to be vestiges of segregation with continuing segregative effects. Only where there are no alternative remedies that are practicable and educationally sound is the state defendant relieved of its obligation to remedy the vestiges' effects. *Fordice,* —— U.S. at ——, 112 S.Ct. at 2736.

Similarly, it would not necessarily follow that ASU and A & M must be confined to the most restrictive of the mission categories for four-year universities. In other words, assuming that it is true that some of the state's four-year universities must have limited mission assignments, it does not logically follow that ASU and A & M must be among those

thus confined. For these reasons, the district court's finding that ACHE's system of mission differentiation is educationally sound does not dispose of plaintiffs' missions claim.

Because the district court has not ruled on whether ASU and A & M's current mission assignments have continuing segregative or discriminatory effects that must be remedied, we instruct the district court to address this claim on remand. The court should determine (1) whether the limited missions, alone or in combination with other policies, continue to have segregative effects on student choice; and (2), if so, whether, after assessing the full range of possible alternative remedies, including plaintiffs' proposed remedy and closure, there are practicable and educationally sound policies that would reduce or dismantle the segregative effects. On each of these two questions it is, of course, with the state defendants and not the plaintiffs that the burden of proof lies.

### C. *Allocation of State and Federal Land Grant Aid*

#### 1. Background Facts

The second major issue raised in this appeal concerns whether Alabama should be required to divide more evenly between its two land grant universities—historically white Auburn and historically black A & M— state and federal aid for agricultural research and extension work. Since the late nineteenth century, the federal government has each year provided to land grant universities designated by each of the states financial aid for the purpose of developing and disseminating knowledge pertaining to agriculture and home economics. The financial aid supports two separate but closely linked programs. The first is a program to conduct research into agricultural and other problems. The second is an extension service to disseminate the fruits of that research to the citizens of the state. The research component of the land grant program is conducted through agricultural experiment stations established in each state. The extension component is conducted in communities across the state by a cooperative extension service established in each state. Although agricultural issues and problems are the primary

focus of the land grant programs, land grant research and extension work is also conducted in the areas of social work, health, nutrition, and economic development. *See* Auburn Exhibit 79.

Under federal law, control of both the research and extension components of each state's land grant program is to be vested in land grant universities of the recipient state. *See* the district court opinion, 787 F.Supp. at 1140–46, for a history of the federal land grant system under which public universities were designated as land grant institutions pursuant to the Morrill Acts of 1862 and 1890. Each year Alabama receives approximately $4 million from the federal government, mostly pursuant to the Hatch Act, 7 U.S.C. § 361a *et seq.,* to fund agricultural research in the state. Federal law empowers states such as Alabama that have two land-grant universities to choose how to distribute the funds between the two. Alabama has, by statute, chosen to allocate all of its Hatch Act research funds to Auburn to conduct research through the Alabama Agricultural Experiment Station ("AAES"), an institution over which, pursuant to the same statute, Auburn exercises complete control. 787 F.Supp. at 1146, ¶¶ 571–72. Each year Alabama supplements the federal Hatch Act funds with approximately $14 million in additional funds that it appropriates and gives to Auburn, also for agricultural research at AAES. Knight Exhibit 2–10, Table 1.

In comparison, A & M, which for years received virtually no federal aid for research, now receives approximately $1.4 million each year, mostly pursuant to a federal law, the 1977 Evans–Allen Farm Bill, Pub.L. No. 95–113, which designates A & M as the recipient institution and denies the State of Alabama any discretion to reallocate the aid elsewhere. Until the late 1960's, A & M received absolutely no state aid for agricultural research. With the election of blacks to the Alabama legislature for the first time since Reconstruction following passage of the 1965 Voting Rights Act, A & M began to receive a very modest amount of state research aid. This assistance today still totals less than $200,000 each year. Knight Exhibit 6, Table 1; Knight Exhibit 2–10, Table 1.

As for extension work, each year Alabama receives approximately $12 million from the federal government pursuant to the Smith–Lever Act, 7 U.S.C. § 341 *et seq.,* to fund agricultural extension services administered by the state's land grant universities. As with the federal research aid, Alabama allocates all of this aid to Auburn to which it has granted exclusive control of the Alabama Cooperative Extension Service ("ACES"). In addition, the state supplements the federal aid each year with approximately $15 million in state funds. Knight Exhibit 2–10, Table 2. In contrast, A & M, which has received federal aid under a separate program only since 1972 receives only a little more than $1 million each year from the federal government for extension work. The state gave A & M no money at all for extension until 1982 and currently contributes only approximately $200,000 each year. Knight Exhibit 6, Table 3; Knight Exhibit 2–10, Table 2.

2. Plaintiffs' Arguments

Plaintiffs charge that the state's granting Auburn sole control of both the AAES and ACES and the resulting allocation to Auburn of a radically disproportionate share of state and federal land grant monies is a vestige of segregation that continues to have segregative effects that the state is duty-bound to remedy. Addressing the first part of the *Fordice* test, plaintiffs contend that the fact, recognized by the district court, *see* 787 F.Supp. at 1171, ¶ 769, that Auburn was given control of the land grant program in part for discriminatory reasons is sufficient to render Auburn's continued control "traceable" to discrimination, and thus a vestige of segregation.

As to the second part of the *Fordice* test, plaintiffs contend that the state's awarding to Auburn of the vast majority of state and federal land grant aid has several continuing segregative effects. First and most importantly, plaintiffs argue that this policy has a segregative effect on student enrollment choices. Plaintiffs charge that Auburn's annual receipt of approximately $45 million in research and extension funds dramatically enhances its agriculture and home economics programs, to the benefit of its students.

This aid, while ostensibly not granted for the purposes of benefitting students, nonetheless, plaintiffs contend, permits Auburn to maintain a much larger faculty and far broader curriculum than it otherwise would, and affords Auburn students the opportunity to participate in ongoing research. *See* Stipulation of Facts at 40, ¶ 163; A & M Exhibit 288 at 173–74; A & M Exhibit 570 at 14. Plaintiffs argue that the state's disproportionate allocation of land grant aid to Auburn, and the corresponding virtual denial of aid to A & M, have disadvantaged A & M's agriculture and home economic programs, preventing them from effectively attracting white students and thereby exacerbating segregation. Knight Plaintiffs' Initial Brief on Appeal at 37, 40–41.

Second, plaintiffs also argue that Alabama's allocation of virtually all land grant aid to Auburn has had a discriminatory effect on black farmers in the state. They note that Auburn's own expert witness acknowledged that as a result of the state's awarding to Auburn control of the land grant programs, black Alabamians "w[ere] barred from participation in the land grant programs." 787 F.Supp. at 1148, ¶ 585. Plaintiffs argue that this complete denial of access to extension support services necessarily contributed to the precipitous decline in the number of black farmers in Alabama over the course of this century, Knight Plaintiffs' Initial Brief on Appeal at 40–47, and that the current diminished numbers of black farmers are a continuing discriminatory effect of the policy of vesting Auburn with sole control of the land grant programs.

Third, plaintiffs argue that, in light of the fact that Auburn is a white-controlled and dominated institution, Auburn's control of the land grant programs has the discriminatory effect of excluding black Alabamians from the land grant policy-making process. They charge that there is effectively no black input into land-grant policy because blacks are severely underrepresented on Auburn's board of directors and in its administration. *See* 787 F.Supp. at 1191–92, ¶¶ 961–62. This exclusion, they contend, constitutes a discriminatory effect in its own right regardless of whether today the land grant policies estab-

lished under the Auburn-controlled program can be shown to disfavor black farmers or consumers. Knight Plaintiffs' Initial Brief on Appeal at 49–50.

Finally, having argued that the current allocation of land grant funds is traceable to segregation and continues to have discriminatory effects, plaintiffs contend that Alabama is therefore obligated to reallocate a portion of the funds to A & M because, under the third part of the *Fordice* test, defendants cannot show that the remedy plaintiffs propose would be impracticable or educationally unsound. The remedy sought by plaintiffs is to have a share of state and federal research and extension funds reallocated to A & M to finance "A & M's innovative urban-oriented cooperative extension program." A & M's Initial Brief on Appeal at 10. This program, which "deals with low income families and families at risk, nutrition, youth development, career orientation, urban economic development, and assisting small businesses," *id.*, is currently being administered by A & M on a very small scale in the Huntsville region. Plaintiffs contend that it would not be inefficient or duplicative for A & M to conduct research and administer extension services in this subarea because Auburn's research and extension programs do not currently focus on these issues. *Id.* at 21–24. Thus, plaintiffs argue, even if it were determined that efficiency concerns make it impracticable for Auburn and A & M to share control over agricultural research and extension, such concerns would not preclude the proposed remedy.

### 3. Defendants' Arguments

Defendants maintain that the state need not alter its policy of allocating to Auburn the lion's share of state and federal land grant funds. First, they contend that, under the first part of the *Fordice* test, allocation of such funds to Auburn is not a vestige of segregation because the funding policy is not traceable to *de jure* segregation. Defendants charge that even though the practice of allocating such funds to Auburn was made, in part, for discriminatory reasons, the survival today of that allocation pattern is not traceable to the past discrimination because, defen-

dants argue, the funds likely would have been allocated to Auburn anyway even if there had been no discrimination in the past. Defendants maintain that the causation principle set out in *Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), applies to Fourteenth Amendment desegregation jurisprudence and affords them a defense from liability for their land grant funding practices. Auburn's Brief on Appeal at 44–46. Second, even if the allocation of land grant funds is deemed traceable to segregation, defendants argue that they are still under no obligation to modify the policy because, under the second part of the *Fordice* test, it has no current segregative effects. In support of this claim defendants cite the district court's rulings that Auburn's control of the land grant programs has not had a discriminatory effect on black farmers in Alabama or on black Alabamians generally. Auburn's Brief on Appeal at 46–47 (quoting 787 F.Supp. at 1171, ¶¶ 774–76). Third, defendants contend that even if Auburn's continued receipt of virtually all land grant funding is a vestige of segregation with continuing segregative effects, reallocation of a portion of those funds to A & M is not required because it would be impracticable and educationally unsound to further divide control of the land grant program between Auburn and A & M. *Id.* at 47–48.

### 4. District Court Ruling

The district court began its analysis of the land grant funding issue by noting, first, that "There is no dispute that Auburn University receives a vastly larger percentage of both state and federal funds for agricultural research and extension work than does A & M," 787 F.Supp. at 1170, ¶ 762, and second, that "the state's decisions concerning the allocation of federal land grant funds to Auburn in the late nineteenth and early twentieth century resulted in part from racial discrimination." *Id.* at 1171, ¶ 769. The court canvassed this history in several pages of detailed factual findings. *See id.* at 1140–53.

However, the court concluded that the radically disproportionate allocation of land grant funds to Auburn, and in particular the placement of AAES and ACES under Auburn's exclusive control, are not vestiges of discrimination. The court reasoned that even if, hypothetically, discrimination had not determined the allocation of land grant funds and resources in the late nineteenth and early twentieth centuries, the resources would probably have been disproportionately allocated to Auburn anyway. The court based this conclusion on two facts. First, in 48 of the other 49 states, 34 of which did not practice *de jure* segregation, all state and federal land grant funds are allocated to a single university that administers the state's research and extension programs. *Id.* at 1171, ¶ 772. Second, Auburn already existed as a thriving land grant college when federal Hatch Act funds for research and Smith–Lever funds for extension first became available to the states in the late nineteenth and early twentieth centuries while A & M was at that time a vastly inferior institution. *Id.* at 1171, ¶ 773. On the basis of these facts, the court concluded that even if there had not been discrimination, Alabama, like the other states, would probably have chosen to place all of its research and extension funds under the control of a single institution and that that institution would probably have been Auburn. *Id.* at 1171–72, ¶¶ 776–778.

The court concluded that on account of this "causation" finding, the current land grant funding policy cannot, as a matter of law, constitute a vestige of discrimination. *Id.* at 1172, ¶ 778. The court based this conclusion on *Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). 787 F.Supp. at 1360–61, ¶¶ 43–45. The *Mount Healthy* principle is a causation-based defense to liability. Where this defense applies, a defendant may avoid liability, even after a plaintiff has shown that a challenged action was taken for an otherwise impermissible purpose, by showing that even absent the illicit purpose, the same action would still have been taken for different, legitimate reasons.

### 5. Analysis

We conclude that the district court's "causation" ruling was erroneous. Applying the *Fordice* standard, it is clear that the

**1550**

policy of allocating to Auburn a disproportionate share of research and extension funds was originally adopted for discriminatory reasons. The district court so found. 787 F.Supp. at 1171, ¶ 769. While the district court did not expressly find that the current continuation of that policy was traceable to the original policy, such a finding is implicit—indeed, inevitable—in light of the district court's particular findings of fact. Moreover, the record so clearly establishes this fact that any finding to the contrary would be clearly erroneous.

The manner in which the district court applied the *Mount Healthy* doctrine in this case was inconsistent with the causation principles articulated in *Fordice*. Once it is determined that a particular policy was originally adopted for discriminatory reasons, the *Fordice* test inquires whether the current policy is "traceable" to the original tainted policy, or is "rooted" or has its "antecedents" in that original policy. Indeed, the Supreme Court expressly held that an otherwise legitimate interim justification for perpetuation of a policy is insufficient to break the causal chain. *Fordice*, —— U.S. at ——, 112 S.Ct. at 2738.

■ Moreover, it simply does not logically follow that the vestige of segregation about which plaintiffs complain would have occurred notwithstanding the discriminatory state actions. The original discrimination was not merely that Auburn received the land grant funds, but rather that the state directed the funds in a manner that discriminated against blacks. It may be true, as the district court found, that Auburn would have been awarded the land grant funds even absent such discriminatory actions. However, it does not follow that that recipient would have been the same Auburn. Rather, had there been no discriminatory state actions, the hypothetical Auburn would have been a nondiscriminatory institution which would have been dedicated to the educational and other interests of all Alabamians, both black and white. In such a hypothetical situation, the vestiges of segregation challenged by plaintiffs, if extant at all, would hardly resemble those of which plaintiffs complain today.[4] Moreover, we cannot say what effects a different combination of policies would have produced. Indeed, the complexity of the causation in a case like this was probably one of the reasons motivating the Supreme Court to articulate the causation principle set out in *Fordice*.

As we have concluded that the land grant funding allocation is traceable to and thus is a vestige of segregation, whether the state is obligated to alter it depends on whether defendants can establish that the allocation does not have continuing segregative effects or, even if it does, that there exists no practicable and educationally sound means of remedying any such effects.

Defendants urge us to affirm the district court's refusal to order reallocation of the land grant funds on the alternative ground that defendants have proven that the funding policy has no continuing segregative effects and that therefore the state, under the second part of the *Fordice* test, need not alter it. In order to affirm on this basis we would, at a minimum, have to conclude that all three types of continuing segregative effects pointed out by plaintiffs, as well as other combined effects, are, in fact, unfounded. However, the district court has addressed only one of the three: the contention that the land grant allocation has had a discriminatory effect on black farmers in Alabama. 787 F.Supp. at 1171, ¶¶ 774–75. It is true that the district court did make a more general statement that "there is no indication that ... control by Auburn [of the land grant program] adversely [a]ffect[s] the African American citizens of the state." *Id.* at 1171, ¶ 776. However, although it is broadly worded, this language appears to address only the question of whether the nature and quality of the extension services being offered under Auburn's administration of the land grant program have a disparate impact on black Alabamians. We do not interpret it as ruling on the two other types of discriminatory effects pointed out by plaintiffs: that the

4. Thus, properly applied, the *Mount Healthy* principle would not afford the state a defense in this case. Accordingly, we need not decide whether the *Mount Healthy* principle might, in other circumstances, be applicable in cases to which the *Fordice* analysis applies.

allocation of land grant aid continues to harm A & M's academic programs and so has a segregative effect on student enrollment choices in the same way that poor facilities or limited missions do; and that vesting Auburn with control of the land grant program has the discriminatory effect of denying black Alabamians meaningful participation in setting land grant policy since blacks are extremely underrepresented on Auburn's board of directors and in its administration. Because the district court did not rule on whether the current land grant funding allocation has either of these alleged effects, denial of the land grant claim cannot be affirmed on the alternative ground that the funding policy has no continuing segregative or discriminatory effects.

■ Defendants also argue that, regardless of whether the current land grant funding allocation has segregative effects, the district court's refusal to order relief in the area can be affirmed on yet another alternative ground. Defendants contend that the district court found that the disproportionate allocation of land grant funds to Auburn cannot practicably be modified and is required for educational policy reasons. This alleged finding, they assert, relieves the state, under the third part of the *Fordice* test, of any duty to reallocate the land grant funds. This argument is unavailing for several reasons.

First, although the district court found that, as a general matter, it is most efficient to concentrate land grant programs and funds under the control of a single institution, 787 F.Supp. at 1171, ¶ 777, the court expressly declined to rest its refusal to order relief on the land grant claim on this ground. The court wrote:

> So that it is clearly understood, the Court is not basing its decision on an economic efficiency analysis, but rather on the [causation theory discussed above].

*Id.* at 1172, ¶ 778. In the face of such a reservation, we would be loath to entertain the possibility of affirming on the alternative ground expressly disavowed by the court below. Furthermore, in this case, the ruling made by the district court does not directly address the issues relevant to determining the availability of the defense established under the third part of the *Fordice* test. The court's finding that Alabama's current land grant system is "the most economically efficient means of delivering the services needed in aid of the state's agricultural interest," *id.* at 1171, ¶ 777, does not necessarily resolve the question that is relevant under *Fordice:* whether, from among the full range of alternative remedies, including plaintiffs' proposed remedy and closure, there are any practicable and educationally sound alternative remedies that would reduce or dismantle the identified segregative effects. In other words, even if it were true that partial reallocation of the land grant funds would result in a research and extension system somewhat less efficient than the one currently operating under Auburn's monopoly, it would not inescapably follow that such inefficiency would render the proposed modified system impracticable or educationally unsound.

■ Unable to affirm denial of the land grant claims on the alternative grounds urged by defendants, we must remand so that the district court can consider the claim again. We reverse the court's ruling that the current allocation of land grant funds between Auburn and A & M is not a vestige of discrimination. We hold, based on the district court's findings concerning discrimination, that the current allocation of land grant funds is traceable to past discriminatory decisions and therefore, under the first part of the *Fordice* test, is a vestige of segregation. We remand the claim to the district court with instructions that it first consider whether the current allocation of funds, in combination with other policies, has continuing segregative effects as required under the second part of the *Fordice* test. For example, the district court should consider whether Auburn's receipt of a disproportionate share of land grant funds, in combination with other policies, has continuing segregative effects on student choice. If so, the court should then address, under the third part of the *Fordice* test, the full range of alternative remedies, including plaintiffs' proposed remedy and closure, to determine whether those segregative effects can be remedied through practicable and educationally sound practices. We note again that on

these inquiries under the second and third parts of the *Fordice* test, the burden of proof lies with defendants.[5]

### D. *Campus Curricula at HWIs*

The third ruling challenged by plaintiffs on appeal is the district court's denial of their claim for relief regarding the curricula at the HWIs. Plaintiffs charge that African–American thought, culture, and history are not well reflected in the general curricula of Alabama's HWIs, and are excluded altogether from their core curricula. This marginalization, they contend, is traceable to Alabama's past system of segregation and continues to have segregative effects by making the HWIs' environments less welcoming to black students, thereby impeding the HWIs from effectively attracting more black students. Arguing that under *Fordice* the HWIs are therefore obligated to remedy the continuing effects of this vestige of segregation, they seek as relief an order instructing the defendant HWIs to develop a plan for increasing the representation of black thought, culture, and history in their respective curricula, particularly their core curricula.

Addressing this claim, the district court found that

> Without doubt, the African American experience is not widely disseminated to students through the core curriculum at the predominantly white institutions. This lack of centrality does not mean, of course, that the [HWIs] are devoid of black studies or that the black experience is completely neglected. It is not.

787 F.Supp. at 1333, ¶ 1771. However, the court did not then proceed to evaluate whether the representation of black thought, culture, and history in the curriculum was a vestige of segregation with continuing segregative effects that must be remedied. *See*

*id.* at 1333, ¶ 1772. Instead the court held that

> Curricula design has historically been left to the university. One of the central tenets of academic freedom is the right to decide matters of course content. Such freedom is essential to guarantee the unimpeded exchange of ideas. It is not the duty of a federal court to dictate to a university the content of its curriculum; such decisions belong to the institution's faculty *in the absence of a constitutional violation.*

*Id.* at 1333, ¶ 1775 (emphasis added).

In the absence of a constitutional or statutory violation, the district court's statement is no doubt correct. The problem, however, is that the court failed to address whether in this case there has been such a violation with respect to the curricula at the HWIs.

■■■■ Defendants suggest that this denial of relief may be affirmed on the ground that the First Amendment vests in public universities a right to academic freedom and autonomy over educational policy-making which erects an absolute bar against the granting of relief, even on a Fourteenth Amendment claim, in the area of curricula. University of Alabama's Brief on Appeal at 43–44; Troy State University's Brief on Appeal at 48–50. We reject this theory of an absolute bar. The case chiefly relied upon by defendants speaks of academic autonomy being a "concern" of the First Amendment and of deference being appropriate when conducting substantive due process review of certain professional academic decisions. *See Regents of University of Michigan v. Ewing,* 474 U.S. 214, 226 & n. 12, 106 S.Ct. 507, 514 & n. 12, 88 L.Ed.2d 523 (1985). It does not hold that the First Amendment absolutely precludes relief in circumstances where it is determined that remedying a constitutional violation requires regulating or overriding an edu-

---

**5.** Plaintiffs urge us to reverse as clearly erroneous the district court's finding that, despite decades of discrimination against black farmers under the Auburn-administered land grant program, Auburn's control of the program has not had a discriminatory effect on black farmers in Alabama. Knight Plaintiffs' Initial Brief on Appeal at 41–48; 787 F.Supp. at 1171, ¶¶ 774–75. However, this finding was not necessary to the

district court's ruling on the land grant claim— the court rested its dismissal on the causation ground—and disposition of the land grant claim on remand may well not ultimately rest on this finding. Therefore, we decline to review the finding at this time. Plaintiffs remain free to raise the issue, if necessary, on a subsequent appeal.

cational policy decision made by a public university.

It is possible that First Amendment concerns should indeed be considered when assessing whether relief should be granted in this case on the curriculum claim. We decline to decide at this time whether the curriculum claim indeed implicates First Amendment concerns and, if so, what form of legal analysis ought to be applied to take those concerns into account. It is not appropriate for us to rule on these issues as they have not been addressed by the district court and have received inadequate briefing by the parties.

We therefore vacate the district court's ruling denying relief on the curriculum claim and remand the claim for reconsideration. On remand the district court should address defendants' First Amendment arguments and the appropriate role for First Amendment concerns in applying *Fordice* to this case. As regards the *Fordice* analysis itself, the court should determine whether the curricula at the different HWIs are indeed deficient in the degree to which they incorporate black thought, culture, and history. The court should then proceed to determine whether that marginalization, if any, is traceable to Alabama's past regime of segregation and discrimination and, if so, whether, by itself or in combination with other vestiges of segregation, it has continuing segregative effects on student choice. Finally, if the court concludes that any identified vestigial deficiencies indeed have such an effect, it should evaluate the full range of possible alternative remedies to determine whether any alternative is practicable and educationally sound. We decline at this time to suggest how First Amendment concerns should play into the *Fordice* analysis.

### E. *Campus Climates at HWIs*

The fourth ruling challenged by plaintiffs on appeal is the district court's denial of their claim concerning the racial climates at the HWIs. Plaintiffs charge that there persist at the HWIs environments of racial hostility toward blacks. They argue that, under *Fordice*, these racist climates are traceable to Alabama's past system of segregation and

continue to have segregative effects in that they discourage black students from attending the HWIs. Plaintiffs seek an order "requir[ing] every [HWI] to include in its annual report [to the court mandated under the remedial decree] the specific steps it has taken to relieve features of its campus environment that are hostile to African Americans and the extent to which its efforts have been successful." Knight Plaintiffs' Initial Brief on Appeal at 52.

■ Addressing this claim, the district court found that

> The record is replete with examples of state institutions confronting head on this unfortunate legacy through symposia, student activities and services and university sponsored commemorations of the Civil Rights Movement and its leaders. There is no credible evidence that any institution in Alabama is fostering through official or unofficial policy a racially inhospitable climate on its campus or denying black students full participation in all campus activities.

787 F.Supp. at 1332, ¶ 1768. The finding that no defendant institution is, through its policies, fostering a racially hostile climate on its campus is an insufficient basis for denying relief on the climate claim. Under *Fordice*, even absent any such policy or intent, a university that maintains a climate traceable to segregation with continuing segregative effects must remedy the climate to the extent that such can be done in a practicable and educationally sound manner.

■ However, we interpret the first sentence of the quoted text as containing an implicit finding that, in fact, the defendant HBIs are doing all that they can practicably do to counter racial hostility in their campus climates. This finding, which we hold is not clearly erroneous, does constitute a sufficient ground for refusing to order relief on the climate claim, for where a defendant institution is doing all that it practicably can to remedy the effects of a vestige of segregation, there necessarily exists no practicable relief that a court can order on the claim. Thus, we affirm as proper the district court's denial of relief on the climate claim.

## F. *Standing of Alabama State University and Alabama A & M University*

ASU and A & M seek to challenge in this appeal the sufficiency of the remedy ordered by the district court with respect to annual state funding for the HBIs and the physical facilities at the two institutions. ASU also seeks review of the relief ordered to remedy program duplication between ASU and Troy State University in Montgomery ("TSUM"). ASU's Initial Brief on Appeal at 40–48; A & M's Initial Brief on Appeal at 34–36. The Knight plaintiffs have chosen not to appeal these issues at this time, deciding instead to wait "until compliance with the limited relief ordered has been evaluated for effectiveness" before seeking review of the sufficiency of the remedy in these areas. Knight Plaintiffs' Initial Brief on Appeal at 24. ASU also appeals a ruling made by the district court in a pretrial order holding that ASU may not, for lack of standing, assert Fourteenth Amendment cross-claims against the state, the state agency defendants, and the HWIs. ASU's Initial Brief on Appeal at 49–53.

### 1. Standing to Assert Cross–Claims

 In an appeal brought during an earlier stage of this litigation, our court held "that ASU, as a creature of the [S]tate [of Alabama], may not raise a Fourteenth Amendment claim under Section 1983" against the state. *United States v. Alabama*, 791 F.2d 1450, 1455 (11th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). Recognizing that that holding is the law of the case, as well as the law of this circuit, ASU has sought to file cross-claims under the Fourteenth Amendment against the state and most of the other state-instrumentality co-defendants proceeding under a different theory. The 1986 appeal held that ASU does not have a cause of action under the Fourteenth Amendment and § 1983 to assert desegregation claims against the state. ASU now argues, however, that it

is entitled to assert such cross-claims against the state on behalf of "the students and faculty, and potential students and faculty, of [ASU]." ASU's Initial Brief on Appeal at 32–33. In other words, ASU contends that it has third-party standing to assert desegregation claims on behalf of these other parties. *Id.* at 49–53.

 In addition to Article III's standing requirements, the Supreme Court has imposed non-constitutional limits on standing to sue. One such prudential limitation is the requirement that parties assert only their own rights and not those of others. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). An exception to this limitation obtains where (1) the relationship between the·plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (2) there is some obstacle to the third party asserting the right. *Singleton v. Wulff*, 428 U.S. 106, 114–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976); *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 809 (11th Cir.1993). The district court held that ASU, in attempting to sue on behalf of its students and faculty, satisfied the first of these two requirements but not the second. The court held that, in view of the fact that the Knight plaintiffs had already been certified as representatives of a class that includes the students, faculty, staff, and administrators of ASU, not only was there no obstacle to ASU's students and faculty asserting their rights for themselves, but, in fact, they were already doing so. Order of March 10, 1990 (R41–897–38–51).[6] We concur in this analysis and affirm the district court's dismissal of ASU's cross-claims on the same basis. *Jaffe v. Sharp*, 463 F.Supp. 222, 231 (D.Mass.1978) (denying third-party standing to sue on behalf of other parties already represented in same action). *But see School Bd. of Rich-*

---

6. [T]he faculty and students of ASU simply do not face the obstacles to adjudication necessary to give their institution standing to raise claims on their behalf. ASU's arguments to the contrary, premised upon its supposed unique position and better familiarity with the complex legal issues involved in this case, are

of no avail. The Knight plaintiffs are as familiar with the issues in this case as are any of the litigants. The Court has no doubt that they will be fully able to protect their interests without the assistance of ASU.
Order of March 10, 1990 (R41–897–38–51).

*mond v. Baliles,* 829 F.2d 1308, 1310–11 (4th Cir.1987).

### 2. Standing to Cross–Appeal

■ As noted above, ASU and A & M seek appellate review of several issues that the Knight plaintiffs have elected not to raise at this time. Because ASU and A & M have the status of defendants in this lawsuit, their appeals are actually cross-appeals. Two of the defendants argue that ASU and A & M lack standing to pursue these cross-appeals and that this court therefore ought not to address the issues not raised at this time by the Knight plaintiffs. Troy State University's Brief on Appeal at 22–24; Auburn University's Brief on Appeal at 38.

■ Whether a party has standing to appeal a trial court judgment is governed by a body of doctrine distinct from that which controls standing to bring suit as a plaintiff, although there is a significant overlap between the two. *See generally* 15A C. Wright, A. Miller, & H. Cooper, *Federal Practice and Procedure* § 3902 (1992). Among the rules reflecting this overlap is "the basic proposition that a plaintiff who lacks standing to bring suit cannot require an appellate court to decide [an appeal] on the merits." *Id.* § 3902, at 61; *United Steelworkers v. Univ. of Alabama,* 599 F.2d 56, 59 (5th Cir.1979)[7]; *Fisher v. Tucson School Dist. No. 1,* 625 F.2d 834, 837 (9th Cir.1980). A related principle is "the general rule that a party may not appeal to protect the rights of others." 15A C. Wright, A. Miller, & H. Cooper, *Federal Practice and Procedure* § 3902, at 68; *Machella v. Cardenas,* 659 F.2d 650, 652 (5th Cir. Unit A Oct. 19, 1981).

ASU and A & M in their cross-appeals attempt to challenge the adequacy of the remedy ordered by the district court, seeking a judgment requiring the state to allocate to them more funds and to order the elimination of some of the competing academic programs of TSUM. Because it seeks greater relief from the state and the HWIs than the district court ordered, the HBIs' cross-appeals attempt to vindicate the same interests

that they would pursue, were they to bring suit as plaintiffs in the district court. However, as we have just discussed, it is the law of the case, as determined in an earlier appeal in this litigation, "that ASU, as a creature of the [S]tate [of Alabama], may not raise a Fourteenth Amendment claim under Section 1983" against the state. *United States v. Alabama,* 791 F.2d 1450, 1455 (11th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). *See supra* Part III.F.1. Although that appeal concerned an issue pertaining only to ASU and so did not make reference to A & M, the legal holding is equally binding on A & M, for it is identical to ASU in all respects relevant to the holding and was at that time also a party to the litigation. We have also concluded above that ASU has no standing in this case to sue as the third-party representative of its students and faculty. *See id.* We hold that, for the same reasons, A & M is barred from asserting such third-party rights, since A & M's students and faculty are also currently represented by the Knight plaintiffs. 787 F.Supp. at 1051. Because ASU and A & M lack standing to assert Fourteenth Amendment claims against the state as plaintiffs, they therefore are similarly barred from pursuing cross-appeals that seek to vindicate the same remedial interests.

The HBIs note that, although they have not done so, the HWIs could have cross-appealed from the district court judgment, challenging the finding of liability and the remedial decree. The HBIs argue that it cannot be the case that the HWIs have standing to cross-appeal but the HBIs do not. ASU's Reply Brief on Appeal at 10 n. 6. Although it appears anomalous, this is, in fact, true, for the reasons that follow.

■ Because it is not generally required that a defendant have any particular "standing" in order to be sued in a trial court, a defendant ordinarily has standing to appeal any ruling on the plaintiff's cause of action that is adverse to the defendant's in-

---

**7.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

terests. *See* 15A C. Wright, A. Miller, & H. Cooper, *Federal Practice and Procedure* § 3902, at 62–63. The primary limitation on defendant's appellate standing is the adverseness requirement which is one of the rules of standing peculiar to the appellate setting. Only a litigant "who is aggrieved by the judgment or order may appeal." *Dairyland Ins. Co. v. Makover*, 654 F.2d 1120, 1123 (5th Cir. Unit B Sept. 4, 1981) (citing *Goldstein v. Andresen & Co.*, 465 F.2d 972, 973 n. 1 (5th Cir.1972)); 15A C. Wright, A. Miller, & H. Cooper, *Federal Practice and Procedure* § 3902, at 61.

In this case the defendant HWIs would have standing to cross-appeal from the district court's judgment. The judgment is adverse to the HWIs insofar as it orders them to take various remedial measures, and requires the state to divert some money and programs away from them to the HBIs. So long as any cross-appeal they filed sought to reduce the scope of the remedy ordered or to overturn the finding of liability, the HWIs would be asserting traditional defendants' interests and so would have standing to appeal, having satisfied the adverseness requirement.

In contrast, the district court judgment is adverse to the HBIs, not to the extent that it found liability and ordered relief but, to the contrary, to the extent that it did not do so. In other words, the HBIs are aggrieved only insofar as more relief was not ordered, and their cross-appeals seek to secure an expansion of the remedy. Such adverseness is not a traditional defendant's interest and instead reflects the fact that, although their party status is as defendants, the HBIs' institutional interests largely coincide with those of the plaintiffs. Because, as discussed above, the HBIs' lack standing to assert these remedial interests against the state as plaintiffs, they cannot cross-appeal as defendants to seek expansion of the district court's remedy. *United Steelworkers*, 599 F.2d at 59.

Apparently recognizing that the limited scope of the relief ordered does not constitute "adverseness" of the sort entitling them to cross-appeal as defendants, the HBIs allege that the judgment is adverse to them in another respect which they maintain is suffi-

cient to confer on them standing to assert their cross-appeals. They argue that the district court's finding of liability imposes on the HBIs an affirmative remedial duty to integrate their campuses by attracting more white students. They charge that the relief ordered is insufficient to enable them to discharge that remedial duty and that therefore they are, as defendants, aggrieved by that insufficiency such that they have standing to cross-appeal seeking an expansion of the remedy. ASU's Reply Brief on Appeal at 9–10.

We hold that adverseness of this sort is insufficient to confer on the HBIs standing to cross-appeal as defendants to seek expansion of the relief ordered. Recognition of such standing would have the result in this case of allowing the institutions to pursue on appeal remedial interests that they have no right to pursue as plaintiffs, and we reject it on that basis. *Cf. Darrow v. Southdown, Inc.*, 574 F.2d 1333 (5th Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978) (where corporation settles shareholder derivative suit, corporate officer co-defendant who is bound by settlement and therefore lacks standing to challenge settlement on appeal in capacity as officer may not circumvent bar by asserting right to appeal in capacity as non-settling shareholder). Because we conclude that ASU and A & M lack standing to assert cross-appeals seeking greater relief, the issues raised in their cross-appeals are not properly before us as they have not been raised at this time by the Knight plaintiffs. We therefore decline to address them.

## IV. CONCLUSION

For the foregoing reasons, we vacate the district court's judgment with respect to the missions claim and remand to the district court for determination of whether the missions have continuing segregative effects and, if so, whether such effects can be remedied in a manner that is practicable and educationally sound. We reverse the district court's ruling that the current allocation of land grant aid between Auburn University and A & M is not a vestige of segregation and remand the land grant claim to the district court for determination of whether the fund-

ing allocation has continuing segregative effects and, if so, whether such effects can be remedied in a manner that is practicable and educationally sound. We vacate the district court's ruling that the granting of judicial relief on plaintiffs' curriculum claim is barred and remand the claim for reconsideration. We affirm the district court's denial of relief on plaintiffs' claim concerning the racial climates at the HWIs. We hold that ASU and A & M have no standing to cross-appeal from the judgment of the district court and therefore we decline to consider the issues that they raise. We affirm the district court's ruling that ASU lacks standing to assert cross-claims against the other defendants.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.