Muhammad Shabazz **FARRAKHAN**, individually aka Ernest S. Walker; Marcus X. Price, individually; Ramon Barrientes, individually; Timothy Schaaf, individually; Clifton Briceno, individually; Al–Kareem Shadeed, individually, Plaintiffs–Appellants,

v.

State of WASHINGTON; Gary Locke, in his official capacity as Governor of the State of Washington; Sam Reed, in his official capacity of Secretary of State and Chief Election Officer for the State of Washington; Joseph Lehman, in his official capacity as Secretary of the Department of Corrections of the State of Washington, Defendants–Appellees.

No. 01–35032.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 2002.

Filed July 25, 2003.

Lawrence A. Weiser, University Legal Assistance, Gonzaga Law School, Spokane,

WA, argued the case for the plaintiffs-appellants. D.C. Cronin and Jason T. Vail, Spokane, WA, assisted on the briefs.

Nancy L. Talner for the American Civil Liberties Union of Washington, Seattle, Washington, amicus in support of Plaintiffs–Appellants.

Nancy Northup, Jessie Allen, Gillian E. Metzger, and Glenn J. Moramarco, for the Brennan Center for Justice, New York, New York, and Anita Hodgkiss and Lori Outzs Borgen, for the Lawyers' Committee for Civil Rights Under Law, Washington, D.C., amici in support of Plaintiffs–Appellants.

Jeffrey Even, Assistant Attorney General, Olympia, WA, argued the case for the defendants-appellees. Christine O. Gregoire, Attorney General, and Daniel Judge, Assistant Attorney General, Olympia, WA, assisted on the briefs.

Appeal from the United States District Court for the Eastern District of Washington; Robert H. Whaley, District Judge, Presiding. D.C. No. CV–96–00076–RHW.

Before: WOOD,* D.W. NELSON and PAEZ, Circuit Judges.

PAEZ, Circuit Judge:

Plaintiffs appeal the district court's grant of summary judgment dismissing their claim that Washington state's felon disenfranchisement scheme constitutes improper race-based vote denial in violation of Section 2 of the Voting Rights Act ("Section 2"), 42 U.S.C. § 1973. Upon conviction of an infamous crime in the state of Washington, each plaintiff was disenfranchised, and none has had his voting rights restored.

The district court determined that although Washington's felon disenfranchisement scheme disenfranchises a disproportionate number of African–American, Hispanic–American, and Native–American minorities, the cause of this disparate impact on their right to vote was external to the felon disenfranchisement provision *itself* and therefore could not provide the requisite causal link between the voting qualification and the prohibited discriminatory result.

Notably, the district court attributed the cause of this discriminatory effect on minority voting power to "discriminatory activity" in Washington's criminal justice system. Although it determined that "Plaintiffs' evidence of discrimination in the criminal justice system, and the resulting disproportionate impact on minority voting power, is compelling," the district court held that evidence of discrimination in the criminal justice system was not significant for purposes of the "totality of the circumstances" analysis used in determining whether a challenged voting practice results in a denial of minority voting rights under Section 2. Instead, focusing on the disenfranchisement scheme itself, the court concluded that there was no evidence that the enactment of Washington's disenfranchisement provision "was motivated by racial animus, or that its operation *by itself* has a discriminatory effect," and therefore determined that Plaintiffs had failed to establish a Section 2 violation.

We disagree with the district court's analysis, because it conflicts with our well-established understanding of Section 2. As recognized by both the Supreme Court and our circuit, a Section 2 "totality of the circumstances" inquiry requires courts to consider how a challenged voting practice

---

* The Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

*interacts with* external factors such as "social and historical conditions" to result in denial of the right to vote on account of race or color. *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *see also Smith v. Salt River Project Agric. Improvement & Power Dist.,* 109 F.3d 586, 595–96 (9th Cir.1997). Because a Section 2 analysis clearly requires that we consider factors external to the challenged voting mechanism itself, we hold that evidence of discrimination within the criminal justice system can be relevant to a Section 2 analysis. In light of the district court's having improperly disregarded this evidence, combined with its assessment that Plaintiffs' evidence of discrimination in Washington's criminal justice system was "compelling," we reverse and remand for further proceedings.

## BACKGROUND

Felon disenfranchisement is a voting restriction that denies citizens who are convicted of felonies the right to vote. Article VI, Section 3 of the Washington State Constitution provides that "[a]ll persons convicted of an infamous crime ... are excluded from the elective franchise."[1] Disenfranchised felons in Washington remain ineligible to vote until they have completed all the requirements of their sentences and have obtained certificates of discharge under Section 9.94A.637 of the Revised Code of Washington ("RCW"). A discharge under Section 9.94A.637 has "the effect of restoring all civil rights lost by operation of law upon conviction." RCW § 9.94A.637(4).

Plaintiffs Muhammad Shabazz Farrakhan, Marcus Price, Ramon Barrientes, Tim Schaaf, Clifton Briceno, and Al–Kareem Shadeed[2] are citizens who were convicted of felonies in Washington state and consequently disenfranchised under Article VI, Section 3 of the Washington State Constitution. None of the plaintiffs has had his civil rights restored under RCW § 9.94A.637.

When Plaintiffs initially filed their complaint, they challenged Washington's disenfranchisement scheme on federal constitutional grounds and as violative of the Voting Rights Act ("VRA").[3] They sought both declaratory and injunctive relief to enjoin Defendants[4] from applying the voting restriction and related statutory provisions against all felons. In allowing Plaintiffs to proceed on their vote denial claim under Section 2, the district court rejected the State's argument that the VRA could not apply to felon disenfranchisement laws. *Farrakhan v. Locke,* 987 F.Supp. 1304, 1311 (E.D.Wa.1997). However, the court

---

1. Under Washington law, an "infamous crime" is a crime punishable by death in the state penitentiary or imprisonment in a state correctional facility. RCW § 29.01.080.

2. Plaintiffs Farrakhan, Price, Shadeed, and Schaaf are African–American. Plaintiff Briceno is Native American. Plaintiff Barrientes is Hispanic–American. Section 2 protects "any citizen who is a member of a protected class of racial minorities." *Gingles,* 478 U.S. at 43, 106 S.Ct. 2752.

3. Plaintiffs challenged both Washington's disenfranchisement law, set out in Article VI, Section 3 of the Washington State Constitu-

tion, and its process for restoring voting rights to those felons who have completed all requirements of their sentence, as provided under former RCW Section 9.94A.220. In 2002, Section 9.94A.220 was amended and recodified as Section 9.94A.637. Unless otherwise noted, all further references are to the version of the statute challenged by Plaintiffs—RCW § 9.94A.220.

4. The defendants are the State of Washington, Washington Governor Gary Locke, Washington Secretary of State Sam Reed, and Secretary of the Washington State Department of Corrections Joseph Lehman (collectively the "State").

dismissed Plaintiffs' constitutional and vote dilution claims and denied Plaintiff Farrakhan's request for leave to file a due process challenge to Washington's statutory scheme governing the restoration of felons' civil rights. *Id.* at 1315.

In their Fourth Amended Complaint, Plaintiffs alleged that Article VI, Section 3 of the Washington Constitution, along with the process set forth for restoration of disenfranchised felons' civil rights, result in the denial of their right to vote on account of race in violation of Section 2. This was the operative complaint upon which the parties relied when they filed cross-motions for summary judgment.

In support of its motion, the State filed a statement of material facts as required by Rule 56.1(a) of the Local Rules for the Eastern District of Washington. In this statement, the State set forth facts that it contended were not disputed regarding (1) Plaintiffs' criminal histories and the fact that none had completed all the requirements of his sentence, (2) the background and history of Washington's felon disenfranchisement law and statistics regarding citizens who had been affected by it, (3) the statutory procedure for restoration of civil rights and reinstatement of the right to vote, (4) the history of Washington's African–American population, (5) the racial and ethnic make-up of Washington's population, (6) the composition of Washington's felony population, (7) the background and work of the Washington State Minority

and Justice Commission, ("WSMJC") and (8) the history of and changes to Washington's voting laws and practices. With the exception of three issues relating to the operation of Washington's disenfranchisement scheme and its history of discrimination against Native Americans, Plaintiffs did not dispute the State's statement of material facts.

To substantiate their vote denial claim, however, Plaintiffs presented statistical evidence of the disparities in arrest, bail and pre-trial release rates, charging decisions, and sentencing outcomes in certain aspects of Washington's criminal justice system.[5] They also submitted expert declarations and relied on the same reports and studies that the State had submitted to show the extent to which these disparities could be attributed to racial bias and discrimination.[6] In addition to this evidence regarding racial bias in Washington's criminal justice system, Plaintiffs offered evidence of the tenuous policy justifications for Washington's felon disenfranchisement law, and presented evidence of the discriminatory intent that guided the enactment of these laws in several states, discussing the similarities between other states' statutes and the one enacted in Washington.

As noted, the district court ultimately granted the State's motion for summary judgment. Despite the fact that there was little dispute over the State's separate statement of material facts,[7] the district

---

**5.** One such statistic showed that although African–Americans constituted 3% of Washington's overall population, they accounted for 37% of the "persistent offender" sentences handed down by Washington courts.

**6.** These reports included the WSMJC 1999 study entitled *The Impact of Race and Ethnicity on Charging and Sentencing Processes for Drug Offenders in Three Counties of Washington State* and the Final Report of Dr. George Bridges, Ph.D., also commissioned by the

WSMJC, entitled *A Study on Racial and Ethnic Disparities in Superior Court Bail and Pretrial Detention Practices in Washington.*

**7.** Although the Local Rules for the Eastern District of Washington require the party opposing a motion of summary judgment to submit a separate document setting forth any disputes it has with the moving party's statement of uncontroverted facts, the Local Rules leave to the court's discretion whether to assume that certain facts have been admitted

court nonetheless characterized Plaintiffs' evidence of discrimination in Washington's criminal justice system and the resulting disproportionate impact on minority voting power as "compelling."[8] However, the district court ultimately concluded that such evidence was insignificant to its inquiry regarding a possible causal connection between the disenfranchisement provision and the disproportionate impact on the number of minorities ineligible to vote.[9] As we explain, the district court's analysis and conclusion misunderstand Section 2's "totality of the circumstances" test, which requires the court to consider the way in which the disenfranchisement law interacts with racial bias in Washington's criminal justice system to deny minorities an equal opportunity to participate in the state's political process.

## DISCUSSION

### I.

Congress enacted the VRA for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S.

301, 315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Initially responding "to the increasing sophistication with which the states were denying racial minorities the right to vote," *Farrakhan,* 987 F.Supp. at 1308, Congress amended Section 2 of the VRA in 1982 to relieve plaintiffs of the burden of proving discriminatory intent.[10] *Chisom v. Roemer,* 501 U.S. 380, 394, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Ruiz v. City of Santa Maria,* 160 F.3d 543, 557 (9th Cir.1998) (noting Congress's statement that the "intent test" was "unnecessarily divisive in that it involved charges of racism on the part of individual officials or entire communities [and] placed an inordinately difficult burden of proof on plaintiffs and [ ] asked the wrong question." (internal alteration and quotation marks omitted)). As amended, Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account

---

without controversy. *See* E.D. Wash. R. 56.1(d) ("In determining any motion for summary judgment, the Court *may* assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by the record set forth in [the opposing party's responsive memorandum]." (emphasis added)). Here, the district court did not indicate whether it assumed that some or all of the state's undisputed facts were "admitted to exist without controversy." The district court's characterization of Plaintiffs' evidence as "compelling" suggests that, at least with respect to some of the State's material facts, it did not assume that they were "admitted to exist without controversy."

8. Because the district court did not explicitly point to any particular aspect of Plaintiffs' evidence of discrimination in Washington's criminal justice system, its assessment of the

strength of Plaintiffs' evidence must refer to both its statistical evidence and the expert studies that analyzed the racial bias evidenced by those statistics.

9. The court further concluded that Plaintiffs lacked standing to challenge the process for restoration of civil rights under Section 9.94A.220, because no Plaintiff had yet qualified for such relief or had even attempted to regain his civil rights.

10. Congress amended the VRA with the express purpose of clarifying that discriminatory intent was not required to establish a Section 2 violation after a plurality of the Supreme Court held that the pre–1982 VRA, like the Fifteenth Amendment, required proof of discriminatory intent. *See City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. Thus, a plaintiff may establish a Section 2 violation by showing that, based on of the totality of the circumstances, the challenged voting practice results in discrimination on account of race.[11]

The Senate Report accompanying the 1982 amendments identified "typical factors" that may be relevant in analyzing whether Section 2 has been violated:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

(9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

■ *See* S.Rep. No. 97–417, at 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07 ("Senate Report"). Congress did not intend this list to be comprehensive or exclusive, nor did it intend that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 29. Rather, as ex-

---

**11.** We have held that the totality of the circumstances approach applies to both vote dilution and vote denial claims. *Salt River,* 109 F.3d at 596 n. 8.

plained by the Supreme Court, in examining the totality of the circumstances to determine whether a challenged voting practice results in vote denial or vote dilution on account of race, courts must consider how the challenged practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. 2752.

## II.

■ As a preliminary matter, we agree with the district court that Plaintiffs' claim of vote denial is cognizable under Section 2 of the VRA. Felon disenfranchisement is a voting qualification, and Section 2 is clear that *any* voting qualification that denies citizens the right to vote in a discriminatory manner violates the VRA. 42 U.S.C. § 1973. Indeed, the Supreme Court has made clear that states cannot use felon disenfranchisement as a tool to discriminate on the basis of race, *see Hunter v. Underwood*, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (holding that where racial bias motivated its original enactment, a facially neutral felon disenfranchisement law violated the Equal Protection Clause), and Congress specifically amended the VRA to ensure that, "in the context of all the circumstances in the jurisdiction in question," any disparate racial impact of facially neutral voting requirements did not result from racial discrimination, Senate Report at 27; *see also*

*Chisom v. Roemer*, 501 U.S. at 394 & n. 21, 111 S.Ct. 2354.

Permitting a citizen, even a convicted felon, to challenge felon disenfranchisement laws that result in either the denial of the right to vote or vote dilution on account of race animates the right that every citizen has of protection against racially discriminatory voting practices. Although states may deprive felons of the right to vote without violating the Fourteenth Amendment, *Richardson v. Ramirez*, 418 U.S. 24, 54–55, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), when felon disenfranchisement results in denial of the right to vote or vote dilution on account of race or color, Section 2 affords disenfranchised felons the means to seek redress.[12]

## III.

Next, we consider whether the district court erred in failing to consider evidence of racial bias in Washington's criminal justice system in determining whether Washington's felon disenfranchisement laws result in denial of the right to vote on account of race. We hold that it did, as the district court misconstrued the causation requirement of a Section 2 analysis.

## A.

Relying extensively on our decision in *Salt River*, 109 F.3d at 594–96, the district court concluded that Plaintiffs had failed to demonstrate that Washington's felon disenfranchisement provision was either "motivated by racial animus, or that its operation *by itself* has a discriminatory effect."[13]

---

**12.** In so holding, we note that the Sixth Circuit proceeded to engage in a Section 2 analysis to evaluate a challenge to Tennessee's felon disenfranchisement statute, *see Wesley v. Collins*, 791 F.2d 1255 (6th Cir.1986) (ultimately holding that the Tennessee statute did not violate the VRA), and that the Second Circuit, sitting *en banc*, split five-to-five on the question of whether disenfranchised felons

could state a claim under the VRA. *Baker v. Pataki*, 85 F.3d 919 (2d Cir.1996).

**13.** The district court also relied on the Eleventh Circuit's decision in *Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999), in "weighing the significance of Plaintiffs' evidence." In *Burton*, tenants of a predominantly black housing project claimed

Although it determined that the disenfranchisement statute resulted in the underrepresentation of minorities in Washington's political process, the district court found that Plaintiffs had failed to satisfy their causal burden because the cause of the underrepresentation "is not the voting qualification; instead, the cause is bias external to the voting qualification," i.e., discrimination in the criminal justice system.[14] In so ruling, the district court applied a causal standard at odds with the *Salt River* decision (which "compelled" its understanding of the Section 2 analysis), the plain language of the VRA, its legislative history, and other well-established judicial precedent.

■ Section 2 plainly provides that a voting practice or procedure violates the VRA when a plaintiff is able to show, based on the *totality of the circumstances*, that the challenged voting practice results in discrimination on account of race. 42 U.S.C. § 1973. The Supreme Court has interpreted "[t]he essence of a [Section] 2 claim" to be "that a certain electoral law, practice, or structure *interacts with social and historical conditions* to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. 2752 (emphasis added). Thus, it is clear that whether a particular practice results in vote denial or vote dilution in violation of Section 2 always depends on the "totality of the circumstances" in which the practice operates.

In fact, in *Salt River*, we applied the totality of the circumstances test to determine whether an agricultural improvement and power district's land ownership voting qualification violated Section 2. 109 F.3d at 594–95. The plaintiffs were African–American, non-landowning residents of the district who claimed that the land ownership requirement was a racially discriminatory voting qualification because a disproportionate percentage of landowners in the district were white. *Id.* at 588.

In assessing their claim, we considered both the interaction of the challenged land-ownership requirement with the surrounding social and historical circumstances in the district and expert testimony "regarding the relationship, or lack thereof, between race and home ownership" in the district. *Id.* at 590. Deferring to the district court's factual findings, we focused on its conclusion that "the observed difference in rates of home ownership between non-Hispanic whites and African–Americans *is not substantially explained by race but is better explained by other factors independent of race*" which "adequately rebutted any inference of racial bias that the [disparate impact] statistics might suggest." *Id.* at 591 (emphasis added) (internal citations omitted). Because the land ownership rates did not reflect racial discrimination, we concluded that the land ownership re-

---

that the housing authority's refusal to petition and the City's failure to annex the project violated Section 2. *Id.* at 1186. In the view of the district court, the *Burton* decision "acknowledged that historical patterns of housing discrimination had segregated the African–American community . . ., but held that this evidence was insufficient to establish a VRA violation because '[a]lthough Appellants have presented evidence of housing segregation in Belle Glade and in the two centers, we can find no evidence of any discrimination with respect to *voting*. *Id.* at 1198.' "

14. Significantly, the district court concluded that "evidence of discrimination in the criminal justice system is only useful for establishing a generalized climate of discrimination which hinders minority opportunity to participate in the political process," but found that "such evidence, by itself" was not sufficient to establish a causal link between Washington's disenfranchisement provision and minority underrepresentation in Washington's political process.

quirement did not violate Section 2. *Id.* at 594–96.

In so concluding, the *Salt River* court did not focus solely on the land ownership requirement and exclude external factors that helped determine the qualification's disparate racial impact. Instead, we *considered* the external factors, but ultimately concluded that the statistics evidencing the disproportionate percentage of white land-ownership did not reflect racial discrimination and so failed to satisfy the "on account of race" requirement of the results test. As we noted, this conclusion was dictated by the *Salt River* plaintiffs' admission that there was no evidence of discrimination as measured by the Senate Report factors, *id.* at 595–96, and their stipulation to "the nonexistence of virtually every circumstance which might indicate that landowner-only voting results in racial discrimination," *id.* at 595, leaving only a bare statistical showing of disparate impact to support their Section 2 claim.

In light of these constraints, the *Salt River* court's statement regarding the need for evidence of "a causal connection between the challenged voting practice and [a] prohibited discriminatory result," *id.* (internal quotation marks omitted) (alteration in original), simply does not stand for the proposition that the practice must, "by itself," cause the discriminatory result. Indeed, if it did, there would have been no need for the court to consider whether land ownership rates reflected racial discrimination or to assess other totality of the circumstances factors.

Further, demanding "by itself" causation would defeat the interactive and contextual totality of the circumstances analysis repeatedly applied by our sister circuits in Section 2 cases, as they also require a broad, functionally-focused review of the evidence to determine whether a challenged voting practice interacts

with surrounding racial discrimination in a meaningful way or whether the practice's disparate impact "is better explained by other factors independent of race." *Salt River*, 109 F.3d at 591 (internal quotation marks omitted); *see, e.g., Ortiz v. City of Philadelphia Office of the City Comm'rs,* 28 F.3d 306, 310–16 (3d Cir.1994) (acknowledging that Section 2 violations occur when challenged voting practices interact with social and historical conditions to deny minorities equal access to the political process, but ultimately upholding Pennsylvania's voter purge law because there was no evidence that discrimination or societal disadvantages had contributed to low minority voter turnout); *Salas v. S.W. Tex. Junior Coll. Dist.,* 964 F.2d 1542, 1555–56 (5th Cir.1992) (noting that "practical impediments to voting" are relevant in assessing a Section 2 challenge but finding no credible evidence that the effects of prior discrimination—including unemployment, illiteracy, and low income—had contributed to the low voter turnout that caused Hispanics' lack of electoral success, the court held that the real cause of this lack of success was not the challenged voting practice); *Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1358–59 (4th Cir.1989) (upholding an appointive rather than an elective scheme for selecting county school boards because (1) in the few counties in which blacks were significantly underrepresented the disparity was due to the fact that fewer blacks sought appointment, and (2) the composition of the officials responsible for making appointments either manifested no discrimination or should have been addressed through a challenge to the selection procedures for those officials); *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1574 (11th Cir. 1984) (finding that the evidence demonstrated that blacks' lack of success at

the polls was not due to "apathy" but rather due to social and historical factors including "a history of pervasive racial discrimination," and holding that an at-large election system therefore resulted in a Section 2 violation).

Moreover, the district court's "by itself" causation standard would effectively read an intent requirement back into the VRA, in direct contradiction of the clear command of the 1982 Amendments to Section 2. A facially neutral voting qualification, even one that results in substantial discriminatory effects, would only be discriminatory "by itself" if its purpose was to achieve those discriminatory effects. Instead, courts must be able to consider whether voting practices "accommodate or amplify the effect that ... discrimination has on the voting process," *Salt River,* 109 F.3d at 595 n. 7 (internal quotation marks omitted); absent proof that the challenged practice was adopted· or maintained out of overt, intentional racial animus, its disproportionate effect on minority voters could only ever be "on account of race" through its interaction with racial discrimination "outside of the challenged voting mechanism."

■ In sum, although *Salt River* made clear that "a bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the [Section] 2 'results' inquiry" because causation cannot be inferred from impact alone, 109 F.3d at 595, the legislative history of the VRA along with the consistent judicial interpretation of Section 2 clarify that "[e]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." Senate Report at 29 n.117. Certainly, plaintiffs must prove that the challenged voter qualification denies or abridges their right to vote on account of race, but the 1982 Amendments and subsequent case law make clear that factors outside the election system can contribute to a particular voting practice's disparate impact when those factors involve race discrimination. Therefore, under *Salt River* and consistent with both Congressional intent and well-established judicial precedent, a causal connection may be shown where the discriminatory impact of a challenged voting practice is attributable to racial discrimination in the surrounding social and historical circumstances. In light of this determination, we turn to the question of whether evidence of racial discrimination in the criminal justice system qualifies as such evidence.

### B.

As noted above, the Senate Report accompanying the 1982 Amendments identified "typical factors" that may be relevant in analyzing whether a particular voting practice violates Section 2, but Congress did not intend the listed factors to be exhaustive. The legislative history accompanying the 1982 Amendments acknowledged that "while these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative" of a Section 2 violation. Senate Report at 29. Further, the Supreme Court has emphasized the importance of maintaining a practical perspective when evaluating the effects or lawfulness of a challenged voting practice, *Gingles,* 478 U.S. at 46, 106 S.Ct. 2752, and courts have followed this directive in considering the lower socio-economic status of American Indians, *see Old Person v. Brown,* 312 F.3d 1036, 1042 (9th Cir.2002), the disproportionate number of blacks living in poverty and inadequate housing, *see Johnson v. Halifax County,* 594 F.Supp. 161, 169–70 (E.D.N.C.1984), a Board of Education's op-

position to school desegregation, *see Marengo,* 731 F.2d at 1568, and the past and continuing unemployment, illiteracy, and low income that Hispanic citizens face, *see Salas,* 964 F.2d at 1556.

■ Thus, simply because Congress did not specifically identify racial bias in the criminal justice system as a relevant factor in identifying a Section 2 violation does not mean that it should be excluded from a totality of the circumstances analysis. In fact, this kind of evidence is encompassed within the scope of factor (5), directing courts to consider "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health." Senate Report at 29.

This factor underscores Congress's intent to provide courts with a means of identifying voting practices that have the effect of shifting racial inequality from the surrounding social circumstances into the political process. To the extent that racial bias and discrimination in the criminal justice system contribute to the conviction of minorities for "infamous crimes," such discrimination would clearly hinder the ability of racial minorities to participate effectively in the political process, as disenfranchisement is automatic. Thus, racial bias in the criminal justice system may very well interact with voter disqualifications to create the kinds of barriers to political participation on account of race that are prohibited by Section 2, rendering it simply another relevant social and historical condition to be considered where appropriate.

## C.

■ Indeed, had the district court properly interpreted the causation requirement under the totality of the circumstances test instead of applying its novel "by itself" causation standard, the court might have reached a different conclusion.[15] Although we conduct a *de novo* review of the record, in light of the district court's assessment that Plaintiffs' evidence was compelling and its determination that such evidence was insignificant for its analysis of the totality of the circumstances surrounding Plaintiffs' Section 2 claim, we believe that it is appropriate to remand this claim to the district court for further proceedings. On remand, the district court should make any requisite factual findings following an appropriate evidentiary hearing, if necessary, and assess the totality of the circumstances, including Plaintiffs' evidence of racial bias in Washington's criminal justice system.

We recognize that this is a difficult issue and that it requires a searching inquiry into all factors that bear on Plaintiffs' claim. We, however, express no opinion on the merits of Plaintiffs' claim and leave that determination to the district court in the first instance.

---

15. Plaintiffs also presented evidence regarding the tenuous policy justifications for Washington's felon disenfranchisement law. In its order denying the State's motion to dismiss Plaintiffs' vote denial claim, the district court noted our criticism of the underlying policy justifications for Washington's law in *Dillenburg v. Kramer,* 469 F.2d 1222 (9th Cir.1972). Although recognizing that *"Dillenburg* is not good law to the extent that it suggests that the disenfranchisement of felons, on its face, cannot pass constitutional muster," the district court opined that *"Dillenburg* remains applicable ... to the extent that the decision discusses the alleged justifications for felon disenfranchisement statutes." 987 F.Supp. at 1312. The district court also noted that *Dillenburg* was especially critical of "Washington's law in particular, since it denies felons the right to vote based on the *possible* penalty for their offense, rather than their *actual* penalty or conduct." *Id.*

## IV.

Plaintiffs also argue that Washington's statute for the restoration of civil rights, RCW § 9.94A.220, and the process that the State has adopted to implement the statute, violate Section 2.[16] The statute provides:

> (1) When an offender has completed the requirements of the sentence, the secretary of the department [of Corrections] or the secretary's designee shall notify the sentencing court, which shall discharge the offender and provide the offender with a certificate of discharge.
>
> (2) The discharge shall have the effect of restoring all civil rights lost by operation of law upon conviction, and the certificate of discharge shall so state.

RCW § 9.94A.220. Plaintiffs contend that Washington's scheme for restoration of civil rights is "cumbersome, excessively complex, and places difficult burdens on offenders seeking restoration of voting rights."[17] Plaintiffs further argue that the statutory eligibility requirements violate the VRA by causing a disproportionately minority population to be prohibited from registering and voting.

■ With regard to the challenge to the eligibility statute itself, Plaintiffs have produced no evidence that minorities are less able to meet the requirements for restoration.[18] At a minimum, Section 2 requires evidence that the challenged provision results in discrimination. The evidence submitted by Plaintiffs, however, demonstrates only that the disenfranchisement scheme may be discriminatory; Plaintiffs' evidence does not support a similar conclusion with respect to the restoration scheme, except insofar as it reflects any discrimination caused by the disenfranchisement scheme. Without evidence that

---

**16.** As noted, Section 9.94A.220 was amended and recodified as Section 9.94.637. We further note that, along with several revisions to the existing subsections, Section 9.94A.637 contains a new subsection that provides

> (2) The court shall send a copy of every signed certificate of discharge to the auditor for the county in which the court resides and to the department. The department shall create and maintain a data base containing the names of all felons who have been issued certificates of discharge, the date of discharge, and the date of conviction and offense.

However, we analyze Plaintiffs' challenge to Washington's scheme for restoration of civil rights as the statute existed when the Fourth Amended Complaint was filed.

**17.** Plaintiffs state that felony offenders are typically unaware that their voting rights have been revoked upon conviction, and that upon release from incarceration, they are generally uninformed as to their voting status. Additionally, according to Plaintiffs, Washington's Secretary of State has no policy of either providing information to released felons about their status or ensuring that election officials are trained to answer questions regarding the voter eligibility of those convicted of an infamous crime under Washington law. The revised and recodified statute attempts to address some of the alleged deficiencies, as the legislative history accompanying the 2002 Amendments states:

> The legislature recognizes that an individual's right to vote is a hallmark of a free and inclusive society and that it is in the best interests of society to provide reasonable opportunities and processes for an offender to regain the right to vote after completion of all the requirements of his or her sentence. The legislature intends to clarify the method by which the court may fulfill its already existing direction to provide discharged offenders with their certificates of discharge.

2002 Wash. Legis. Serv. 16 § 1 (West).

**18.** Although the district court rejected Plaintiff Farrakhan's standing argument, we hold that he has standing to challenge the statutory eligibility requirements because Farrakhan has completed all terms of his judgment and sentence aside from his monetary restitution obligation.

minorities are less able to complete the eligibility requirements, Plaintiffs' challenge to these requirements must fail.[19]

█ As to Plaintiffs' challenge to the restoration procedures, the district court held that Plaintiffs lacked standing to challenge the restoration scheme because they presented no evidence of their eligibility, much less even allege that they were eligible for restoration, and had not attempted to have their civil rights restored. We conduct a *de novo* review of the standing question, *Hartman v. Summers*, 120 F.3d 157, 159 (9th Cir.1997), and we agree with the district court that Plaintiffs lack standing to assert this claim.

Standing generally requires a plaintiff to establish the following: (1) injury in fact, (2) a causal connection between the injury and the conduct in question, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because Plaintiffs cannot meet the requirement of injury in fact, they lack standing to pursue this claim.

Plaintiffs argue that because Section 9.94A.220 prohibited them from registering and voting, they have suffered an injury in fact. However, proof of this element requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted). Plaintiffs' argument glosses over the fact that they have not been denied the right to vote because of the restoration process, but rather due to the disenfranchisement provision discussed at length above, and because they have not satisfied all the requirements of their sentences to become statutorily eligible for discharge of their convictions. The right to a discharge of conviction arises only upon the completion of all the requirements of the judgment and sentence.

To the extent that the basis for Plaintiffs' asserted injury in fact is the statutory process "as applied," their allegations of harm are conjectural or hypothetical— Plaintiffs speculate that the process would be "cumbersome, excessively complex, and place[ ] a difficult burden on them" should they ever qualify for restoration of their civil rights under Section 9.94A.220.[20] Accordingly, we agree with the district court that Plaintiffs lack standing to challenge the process for obtaining restoration of their civil rights under RCW § 9.94A.220 as a violation of Section 2.[21]

---

**19.** Plaintiffs also argue that the statutory requirement that they repay their monetary obligations in order to be eligible for restoration amounts to a *de facto* poll tax. Although this argument might be cognizable as an equal protection claim, *see Bynum v. Conn. Comm'n of Forfeited Rights*, 410 F.2d 173, 176–77 (2d Cir.1969), we do not consider it here because Plaintiffs have not asserted any equal protection claims.

**20.** Because we hold that Plaintiffs have not established an injury in fact, it is not necessary to address whether they satisfy the other standing requirements.

**21.** As noted, the district court denied Plaintiff Farrakhan's request for leave to file a due process challenge to Washington's statutory scheme governing the restoration of felons' civil rights. *Farrakhan*, 987 F.Supp. at 1315. The district court concluded that Farrakhan lacked standing to pursue this claim. Because the above standing analysis is equally applicable to a putative due process claim, we find no error in the district court's ruling. Indeed, because they are not statutorily eligible for restoration, Plaintiffs no more have standing to challenge the restoration procedures on due process grounds than on Section 2 grounds.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.