BARKETT, Circuit Judge,
dissenting:
I dissent because I believe summary judgment was improperly granted on both plaintiffs’ claims under the Equal Protection Clause of the Constitution and Section 2 of the Voting Rights Act.

I. The Equal Protection Claim

The majority frames the question presented in this case as “whether the plaintiffs have alleged facts that, if true, would be sufficient to establish intentional discrimination in Florida’s current disenfranchisement law.” Majority Op. at 1218 (emphasis in original). The framing of the question in this way dictates an answer that, in my view, fails to correctly analyze the equal protection claim here in the context of a summary judgment motion.
The majority and the district court simply find that because there is no evidence of intentional discrimination in the 1968 reenactment of the relevant constitutional provision, the defendants are entitled to summary judgment. But given the nature of the plaintiffs’ claim and the evidence they present, the court cannot look at the 1968 re-enactment in a vacuum. The plaintiffs contend that the original constitutional provision of 1868 (taking the evidence in the light most favorable to the plaintiffs at this stage) was passed for racially discriminatory purposes.[1] If that is so, then United States v. Fordice, 505 U.S. 717, 739, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), and Knight v. Alabama, 14 F.3d 1534, 1550 (11th Cir.1994) teach us that to repudiate the tainted earlier provision, the government must show not only a lack of intentional racial discrimination in the 1968 re-enactment, but also that the re-enactment was motivated by independent, legitimate goals that “broke the chain” linking it to the original discriminatory motive. This would not require the state to explicitly address the law’s odious origins, but simply articulate the non-racial *1245 policy justification that drove its re-enactment.
Where the state has not demonstrated any race-neutral basis for the re-enactment, there can be no “break” in the chain of invidious intent. See, e.g., Fordice, 505 U.S. at 739, 112 S.Ct. 2727; Knight, 14 F.3d at 1550 (holding that, “[ojnce it is determined that a particular policy was originally adopted for discriminatory reasons, [and] ... is ‘traceable’ to the original tainted policy, or is ‘rooted’ or has its ‘antecedents’ in that original policy” the burden of proof lies with the state to show that it has dismantled the past discrimination to “break the causal chain”). Though the majority cautions that we have never followed the rule of Fordice outside of the educational context,[2] I believe there is no principled basis not to apply Fordice to a matter of equal if not greater importance — the fundamental right to participate in the democratic process. Cf. Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (“the right of suffrage is a fundamental matter .... preservative of other basic civil and political rights”).
In addition to its concerns regarding the application of Fordice outside of the educational context, the majority holds that the rule announced in Fordice is inapplicable here because there are valid public policy reasons for disenfranchising felons, while no such reasons underpinned the educational policies considered in Fordice. Though the valid reasons recognized by the court may have driven Florida’s decision to retain its felon disenfranchisement scheme, the record fails to demonstrate that those reasons in fact motivated the 1968 re-enactment. The court’s attempt to distinguish Fordice based on the existence of a potentially valid public policy thus begs the very question of the motivation behind the 1968 re-enactment. Though valid public policies might have similarly underpinned the educational policies at issue in Fordice, the Court nonetheless required the state to demonstrate that those policies had a sound race-neutral educational justification.
Although the majority does not recognize the Fordice framework as applicable in this context, it nonetheless suggests that the record here supports a conclusion that the 1968 re-enactment was driven by race-neutral considerations because it was “deliberative.” Majority Op. at 1224. There is no indication, however, in the record of deliberations that the subcommittee had any non-discriminatory reasons for re-enacting the disenfranchisement law, nor any indication that the Constitutional Revision Committee as a whole or the legislature even discussed it. While the 1968 subcommittee minutes trace the committee’s procedure and its changes to the disenfranchisement provision’s text, their limited nature sheds no light at all as to whether the committee was motivated by legitimate non-discriminatory reasons, or whether they saw the felon disenfranchisement provision as a legacy of previous constitutions whose justification did not need to be revisited in substance. Cf. Richardson v. Ramirez, 418 U.S. 24, 44, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (“[T]he Journal of that Committee’s proceedings shows only what motions were made and how the various members of the Committee voted on the motions; it does not indicate the nature or *1246 content of any of the discussion in the Committee. While the Journal thus enables us to trace the evolution of the draft language in the Committee, it throws only indirect light on the intention or purpose of those who drafted § 2”). As such, while the adjective “deliberative” describes the procedural aspects of the decision, it need not include any substantive component at all.
The record at this juncture does not permit a conclusion that the legislature’s textual modifications removed the prior racial taint in any meaningful way. Where the provision explicitly disenfranchising all felons remained unchanged in substance, and without evidence that the 1968 reenactment had an independent, legitimate motivation, the majority’s conclusion that the 1968 process cleansed the taint of racial animus as a matter of law is unfounded at this stage of the proceedings. See Fordice, 505 U.S. at 747, 112 S.Ct. 2727 (Thomas, J., concurring) (observing that “discriminatory intent does tend to persist through time”); Kirksey v. Bd. of Supervisors, 554 F.2d 139, 148 (5th Cir.1977) (en banc) (“[Njothing in [Washington v. Davis or Arlington Heights] suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action.”). Indeed, under the majority’s rule, legislatures could continue to utilize statutes that were originally motivated by racial animus, and that continue to produce discriminatory effects, so long as they re-promulgate the statutes “deliberately” and without explicit evidence of an illicit motivation.
To conclude that the 1968 re-passage of Florida’s felon disenfranchisement provision is in and of itself sufficient to “eliminate the racial taint,” the majority relies on the Fifth Circuit’s decision in Cotton v. Fordice, 157 F.3d 388 (5th Cir.1998). The panel in Cotton, like the majority, fails to analyze the claim presented in terms of the government’s burden to show that a legitimate neutral reason underlaid its reenactment of a law tainted by racial animus. However, even if I were to accept the Fifth Circuit’s rule in Cotton, the case is distinguishable on its facts. The statute in Cotton, Mississippi’s felon disenfranchisement law, was originally crafted to intentionally deny the vote to those convicted of so-called “black crimes,” while preserving the franchise for those felons convicted of crimes thought to be committed by whites. Cotton holds that the legislature successfully removed the original “taint” of this discriminatory scheme by removing “black crimes” from the disenfranchising list, and successively adding murder and rape — “crimes historically excluded ... because they were not considered ‘black’ crimes.” Cotton, 157 F.3d at 391. Thus, the legislative amendment process in Cotton proceeded as the converse of the enactment process: the amendment removed those aspects of the law shown to be rooted in racial animus. The same cannot be said for Florida’s felon disenfranchisement law. Its 1968 re-enactment resulted in only non-substantive textual changes to the statute,[3] leaving unchanged *1247 the essential feature that plaintiffs’ evidence links to racial animus: Florida’s disenfranchisement of all felons.
As the district court found and the majority assumes, plaintiffs’ showing of racial animus in the original 1868 enactment raises a genuine issue of material fact as to whether it was adopted with a discriminatory purpose. Where the record is insufficient to conclude that either the 1968 reenactment was motivated by legitimate concerns or that the 1868 provision would have been enacted even without racial motivations, summary judgment was improperly granted.

II. The Voting Bights Act Claim

The simple question before us is whether or not Section 2 of the Voting Rights Act (“VRA”) is applicable to plaintiffs’ claim that they have been denied the right to vote. As the majority states, this is not a vote dilution claim.[4] Although I do not know whether plaintiffs can ultimately succeed, their contention that Florida’s felon disenfranchisement law effectively denies their right to vote because they are black is clearly encompassed by the plain language of the VRA, which prohibits state enforcement of any “qualification or prerequisite to voting” that -“results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ....” 42 U.S.C. § 1978(a) (2005); Farrakhan v. Washington, 338 F.3d 1009, 1016 (9th Cir.2003), cert. denied sub nom. Locke v. Farrakhan, — U.S. -, 125 S.Ct. 477, 160 L.Ed.2d 365 (2004); Baker v. Pataki, 85 F.3d 919, 935-36 (2d Cir.1996) (Feinberg, J., writing for an equally divided court)[5]; Wesley v. Collins, 791 F.2d 1255, 1259 (6th Cir.1986) (considering, without analysis, a felon disenfranchisement claim brought under Section 2 of the VRA); see also, Thornburg v. Gingles, 478 U.S. 30, 45 n. 10, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (“Section 2 [of the VRA] prohibits all forms of voting discrimination .... ”).
The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language unless it is ambiguous. Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); United States v. Fisher, 289 F.3d 1329, 1337-38 (11th Cir.2002). Only when we find ambiguity in the statute’s text do we apply canons of statutory interpretation, such as the canon of constitutional avoidance that the majority utilizes. Dep’t of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 134, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002). *1248 The language of Section 2 of the VRA is unambiguous, and compels a conclusion that it applies to felon disenfranchisement provisions. Such a provision is unquestionably a “voting qualification or prerequisite to voting”[6] that is “applied by [the] state.” 42 U.S.C. § 1973(a) (2005). Whether or not felon disenfranchisement results in vote denial “on account of race or color” under the totality of the circumstances remains the ultimate question for the trier of fact.
Given the plain meaning of the language of Section 2, we are thus squarely faced with the issue of whether its application to felon disenfranchisement schemes is constitutional. I find no constitutional infirmity in applying Section 2 to felon disenfranchisement statutes, and find unpersuasive the majority’s argument that it impermissibly conflicts with Section 2 of the Fourteenth Amendment and raises questions about Congress’ civil rights enforcement powers.
First, there is no conflict between the Constitution and the VRA. The majority’s finding of a conflict between the VRA and Section 2 of the Fourteenth Amendment stems from its failure to distinguish between felon disenfranchisement laws generally and those that result in racial discrimination. Section 2 of the Fourteenth Amendment merely permits states to disenfranchise felons without suffering a reduction in congressional representation. Nothing in Section 2 of the Fourteenth Amendment grants states unfettered discretion to disenfranchise felons, much less permits felon disenfranchisement on the basis of race. Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (“[Section] 2 was not designed to permit the purposeful racial discrimination [in Alabama’s criminal disenfranchisement law] ... which otherwise violates [Section] 1 of the Fourteenth Amendment. Nothing in ... Richardson v. Ramirez suggests the contrary.”). Nor does Section 2 preclude Congress from legislatively addressing criminal disenfranchisement laws that have the effect of disenfranchising felons because of their race pursuant to its civil rights enforcement powers. Baker, 85 F.3d at 936-37 (Feinberg, J., writing for an equally divided court) (citing City of Rome v. United States, 446 U.S. 156, 177, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (explaining that Congress can use its enforcement powers to prohibit conduct that does not itself violate the Civil War Amendments, so long as the prohibitions on racial discrimination in voting are appropriate)). The VRA does not undermine a state’s “delegated power” to disenfranchise felons, as the majority suggests. Applying the VRA’s plain text would not automatically draw into question state disenfranchisement statutes in general. Rather, it would only constrain states from enacting felon disenfranchisement regimes that result in the “denial ... of the right ... to vote on account of race or color.” 42 U.S.C. § 1973(a) (2005) (emphasis added). There is thus no conflict between the limited parameters that the VRA’s Section 2 places on state disenfranchisement laws and the apportionment provisions found in Section 2 of the Fourteenth Amendment.
Second, the majority purports to exclude felon disenfranchisement from coverage under the VRA because of its concern over the lack of a congressional record chronicling constitutional violations stemming from state felon disenfranchisement laws. *1249 While the factual evidence of discrimination that Congress considered in enacting Section 2 did not include evidence of racially motivated felon disenfranchisement, there is no requirement that Congress make factual findings as to every potential application of a civil rights statute passed pursuant to its powers to enforce the Fourteenth and Fifteenth Amendments.[7] This is particularly so where Congress could not even have begun to identify every potential discriminatory voting qualification that would be subject to the VRA, given the “increasing sophistication with which the states were denying racial minorities the right to vote.” Farrakhan, 338 F.3d at 1014; see also S.Rep. No. 89-439, at 10 (1965) (“[E]ven after apparent defeat, resisters seek new ways and means of discriminating. Barring one contrivance too often has caused no change in result, only in methods.”).
Insofar as the majority discerns congressional intent to exclude felon disenfranchisement from coverage under Section 2 of the VRA in subsequent congressional enactments that make provisions for felon disenfranchisement, it again overlooks’ the distinction between felon disenfranchisement laws generally and the narrow subset of such laws that result in racial discrimination. The simple fact that Congress made provisions for felon disenfranchisement in post-VRA statutes says nothing of whether Congress intended to insulate racially discriminatory disenfranchisement schemes from attack under the VRA. Furthermore, where the majority relies on the legislative history of the “test or devices” standard found in Section 4 of the VRA to locate legislative intent as to the application of Section 2 to felon disenfranchisement, its approach overlooks the fact that because the VRA “contains a number of different provisions each with a different objective ... the reader cannot, therefore, assume that each of the sections is designed to reach the same objective or is necessarily to be read in the same manner.”[8] United States v. Uvalde Consol. Indep. Sch. Dist., 625 F.2d 547, 550 (5th Cir.1980); see also Baker, 85 F.3d at 939 (Feinberg, J., writing for an equally divided court) (“[Bjecause [Sections] 2 and 4 have different purposes, scope and language, the legislative history of [Section] 4(c) is not necessarily applicable to the interpretation of [Section] 2.”).
Irrespective of states’ authority to disenfranchise felons,[9] or the frequency with which states have historically exercised that authority, the Supreme Court has made clear that states cannot use felon disenfranchisement to intentionally discriminate on the basis of race. , Hunter, *1250 471 U.S. at 233, 105 S.Ct. 1916. In view of Hunter, there can be no reason why Congress cannot act to prevent such discrimination, using its civil rights enforcement powers to reach felon disenfranchisement laws with racially discriminatory results, as it did in Section 2. See Baker, 85 F.3d at 938 (Feinberg, J., writing for an equally divided court); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (“[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.”).
The majority’s focus on the absence of congressional findings as to felon disenfranchisement, and its disregard of the statutory text, eviscerates Congress’s intent to give Section 2 the “broadest possible scope.” Allen v. State Bd. of Elections, 393 U.S. 544, 566-67, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). More importantly, the majority’s approach renders statutes passed pursuant to Congress’ civil rights enforcement powers little more than stale documents, applicable only to those forms and patterns of discrimination evident at the time of passage and explicitly considered by Congress, irrespective of the breadth of the plain statutory text.
Nor does the “plain statement” rule of Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), which counsels the majority’s avoidance approach, prevent plaintiffs from proceeding under the VRA. The canon of construction at issue in Gregory holds that where Congress intends to alter the “usual constitutional balance between the states and federal government,” it must make its intent to do so unmistakably clear in the statute. Id. at 460-61, 111 S.Ct. 2395 (internal citation marks omitted). As Judge Feinberg concluded in his persuasive opinion, however, the Fourteenth and Fifteenth Amendments altered the constitutional balance between the two sovereigns — not the Voting Rights Act, which merely enforces the guarantees of those amendments. Baker, 85 F.3d at 938 (Feinberg, J., writing for an equally divided court) (citing City of Rome, 446 U.S. at 179, 100 S.Ct. 1548 (holding that the Civil War Amendments “were specifically designed as an expansion of federal power and an intrusion on state sovereignty”)); see also id. at 942 (Newman, J., concurring).
Moreover, the Supreme Court has explicitly held that the Gregory “plain statement” canon is wholly inapplicable where the statutory language unambiguously applies to a particular state function. Pa. Dep’t of Corr. v. Yeskey, 524 U.S. 206, 209, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). In Yeskey, the petitioners contended that under Gregory, state prisons were not subject to the Americans with Disabilities Act based on the lack of a “plain statement” indicating congressional intent to alter the constitutional balance by regulating state prisons. Id. at 208-09, 118 S.Ct. 1952. The Court limited Gregory’s plain statement rule, holding it inapplicable because the prison fell squarely within statutory language providing for coverage of “public entities.” Id. at 209-10, 118 S.Ct. 1952. Similarly, Congress need not have included a “plain statement” on the VRA’s application to criminal disenfranchisement statutes, as those statutes fall squarely within the VRA’s textual prohibition on any “qualification or prerequisite to voting ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U.S.C. § 1973(a) (2005). The only “ambiguity” the majority finds in the VRA is its “conflict” with the Fourteenth Amendment’s apportionment clause. Not only does Section 2’s prohibition on racially discriminatory felon disenfranchisement schemes fail to conflict with the Four *1251 teenth Amendment, as discussed above, but such a perceived conflict is easily distinguishable from the case of ambiguity within a statute’s text, which animated Gregory. See Gregory, 501 U.S. at 469-70, 111 S.Ct. 2395; see also Salinas v. United States, 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (“The plain statement requirement articulated in Gregory ... does not warrant a departure from the statute’s terms. The text ... is unambiguous.”).
While the majority would use this “ambiguity” to avoid the result dictated by the VRA’s plain meaning and dispose of plaintiffs’ claim, I would remand for determination by the trier of fact whether, under the totality of the circumstances[10], plaintiffs’ votes were denied “on account of race” in violation of the YRA.

. The district court found that the ''[p]laintiffs have presented to this Court an abundance of expert testimony about the historical background of Florida's felon disenfranchisement scheme as historical evidence that the policy was enacted ... with the particular discriminatory purpose of keeping blacks from voting.” 214 F.Supp.2d 1333, 1338-39 (S.D.Fla.2002). While ultimately assuming, for the sake of summary judgment, that racial animus motivated Florida’s 1868 disenfranchisement law, the majority goes to great lengths to question the sufficiency of plaintiffs' evidence and to offer alternative explanations for each historical fact that suggests a discriminatory motive. I believe that in doing so the majority erroneously views the facts and draws all reasonable inferences, not in favor of the non-moving party, but rather in favor of the state. See Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir.1995).

. While the majority cites to Burton v. City of Belle Glade, 178 F.3d 1175, 1190 (11th Cir.1999) (finding that "[a]ppellants can point to no court that has ever applied Fordice outside of the education setting”), this circuit has suggested that Fordice applies in the employment setting, preventing public employers from escaping their constitutional obligations simply by enacting race-neutral policies that institutionalize the effects of prior discrimination. See Ensley Branch, NAACP v. Seibels, 31 F.3d 1548, 1575 (11th Cir.1994).

. The 1868 provision, as amended in 1885, provided that "No person under guardianship, non compos mentis or insane shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights.” Fla. Const, art. VI, § 4 (1885). Following the 1968 re-enactment process the text read, "No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.” Fla. Const, art. VI, § 4 (1968). The 1968 changes also eliminated a provision which empowered the legislature to disenfranchise those convicted of certain misdemeanors. Fla. Const, art. VI, § 5 (1885). While the majority emphasizes this revision, the plaintiffs’ evidence of racial intent does not hinge on or relate to the eliminated provision. Un *1247 like the plaintiffs in Cotton, whose claim arose from the disenfranchisement of those committing certain "black crimes”, plaintiffs’ claim of racial bias relates to Florida’s disenfranchisement of all felons.

. While much of the case law interpreting Section 2 of the VRA focuses on the dilution of minority voting strength, see e.g., Holder v. Hall, 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); Nipper v. Smith, 39 F.3d 1494 (11th Cir.1994) (en banc), we have recognized that the statute’s results test, as determined under the totality of the circumstances, applies by its terms to absolute denials of the vote. See Burton v. City of Belle Glade, 178 F.3d 1175, 1196 (11th Cir.1999) ("[T]wo distinct types of discriminatory practices and procedures are covered under Section 2: those that result in 'vote denial’ and those that-result in 'vote dilution.’ ”).

. In Baker, an en banc panel of the Second Circuit considered whether Section 2 of the VRA applied to New York's felon disenfranchisement law. Because the panel divided equally, 5 to 5, the lower court opinion denying VRA coverage was affirmed. While the majority relies heavily on Muntaqim v. Coombe, 366 F.3d 102 (2d. Cir.2004), we note that the Second Circuit has granted en banc review of Muntaqim and has yet to issue its decision. See Muntaqim v. Coombe, 396 F.3d 95 (2d Cir.2004).

. See Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (“Residence Requirements, age, previous criminal record (Davis v. Beason, 133 U.S. 333, 345-47, 10 S.Ct. 299, 33 L.Ed. 637 [1890]) are obvious examples indicating factors which a State may take into consideration in determining the qualification of voters.”) (emphasis added).

. Nor is Congress required to impose temporal or geographic restrictions (whose absence from Section 2 the majority finds so troubling) on statutes passed pursuant to its civil rights enforcement authority. See, e.g., Oregon v. Mitchell, 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (upholding a nationwide ban on use of literacy tests without any expiration date or geographical limit, and without congressional fact-finding on the discriminatory use of literacy tests in every state).

. The majority's citation to United States v. Ward, 352 F.2d 329, 332 (5th Cir.1965) suffers from the same infirmity. Ward simply notes that disqualification for a felony conviction would not qualify as a "test or device” prohibited in those jurisdictions subject to Section 4(c) of the VRA. Nothing in Ward construes or relates to Section 2 of the VRA, much less its coverage of felon disenfranchisement laws.

.Of course, I recognize that non-discriminatory felon disenfranchisement statutes, standing alone, raise no equal protection violation. See Ramirez, 418 U.S. at 54 — 55, 94 S.Ct. 2655.

. Although the district court failed to examine the plaintiffs’ evidence under the totality of the evidence standard that governs Section 2 claims, Judge Tjoflat’s concurrence argues that a remand is unnecessary as 'plaintiffs have been unable to show that whatever denial or abridgment of voting rights resulted from Florida's felon disenfranchisement provision occurred- 'on account of race or col- or.' " First, because plaintiffs are appealing the district court's grant of summary judgment, it is not necessary that they show at this stage that their votes were denied on account of race. Rather, they need only show that genuine issues of material fact remain. That, they have certainly done. As I explained in the panel opinion, as the district court wrongly excluded evidence on several of the "senate factors”, plaintiffs can point to evidence on racially polarized voting, prejudice in the criminal justice system, socio-economic disparities, and a history of official discrimination. Johnson, 353 F.3d at 1305-06 and n. 25. This evidence goes beyond disparate impact, and when considered in the light most favorable to plaintiffs, permits a conclusion that felon status "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Gingles, 478 U.S. at 47, 106 S.Ct. 2752. Moreover, to the extent that Judge Tjoflat’s construction of the "totality of the circumstances” inquiry imposes a requirement that plaintiffs demonstrate discriminatory intent "from somewhere in the relevant community”, such a requirement appears nowhere in the pre-Bolden iterations of the senate factors and is inconsistent with the Congressional objective of eliminating intent from Section 2. See Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) ("[Following Bolden], Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,’ applied by this Court in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and by other federal courts before Bolden.")', Chisom v. Roemer, 501 U.S. 380, 394, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) ("Under the amended statute, proof of intent is no longer required to prove a § 2 violation. Now plaintiffs can prevail under § 2 by demonstrating that a .challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race. Congress not only incorporated the results test in the paragraph that formerly constituted the entire § 2, but also designated that paragraph as subsection (a) and added a new subsection (b) to make clear that an application of the results test requires an inquiry into 'the totality of the circumstances.' ”).